**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
*rclarkson@clarksonlawfirm.com*
Bahar Sodaify (SBN 289730)
*bsodaify@clarksonlawfirm.com*
Alan Gudino (SBN 326738)
*agudino@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, California 90265
Tel: (213) 788-4050
Fax: (213) 788-4070

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN SNEED and NICKOLAS CANNON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE PROCTER & GAMBLE COMPANY,<br><br>Defendant. | Case No. 3:23-cv-05443-JST<br>Case Filed: October 23, 2023<br>FAC Filed: January 26, 2024<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>1. Violation of Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)<br>2. Violation of False Advertising Law (Cal. Bus. & Prof. Code § 17500)<br>3. Violation of Consumers Legal Remedies Act (Cal. Civ. Code §§ 1750, *et seq.*)<br>4. Breach of Warranty<br>5. Unjust Enrichment<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

**Page No.**

I.    INTRODUCTION ....................................................................................................1

II.   JURISDICTION .....................................................................................................5

III.  VENUE ...................................................................................................................5

IV.   PARTIES .................................................................................................................5

      A.    Plaintiffs......................................................................................................5

      B.    Defendant ....................................................................................................8

V.    FACTUAL ALLEGATIONS ..................................................................................8

      A.    Background and the Rise of the Sleep-Aid Market ....................................8

      B.    Defendant's Brand Strategy and Marketing Campaign ............................11

      C.    Falsity of the Challenged Representations................................................14

      D.    Plaintiffs' Expert Confirms Diphenhydramine Is Habit Forming ............17

      E.    Plaintiffs and Reasonable Consumers Were Misled by the Challenged

            Representation into Buying the Products, to Their Detriment...................19

      F.    The Products' Substantial Similarity .......................................................23

      G.    No Adequate Remedy at Law ...................................................................24

VI.   CLASS ACTION ALLEGATIONS ......................................................................26

VII.  CAUSES OF ACTION .........................................................................................29

      COUNT ONE.........................................................................................................29

            A.    "Unfair" Prong..................................................................................32

            B.    "Fraudulent" Prong ...........................................................................34

            C.    "Unlawful" Prong .............................................................................35

      COUNT TWO........................................................................................................36

      COUNT THREE .....................................................................................................38

      COUNT FOUR ......................................................................................................42

      COUNT FIVE.........................................................................................................45

VIII. PRAYER FOR RELIEF .......................................................................................46

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

SECOND AMENDED CLASS ACTION COMPLAINT

DEMAND FOR JURY TRIAL........................................................................................................47

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

**SECOND AMENDED COMPLAINT**

1.    Plaintiffs Stephen Sneed and Nickolas Cannon ("**Plaintiffs**"), individually and on behalf of all others similarly situated, as more fully described herein (the "**Class**" and "**Class Members**"), bring this class action complaint against Defendant The Procter & Gamble Company ("**Defendant**"), and allege the following based upon information and belief (including the investigation of Plaintiffs' counsel), unless otherwise expressly stated as based upon personal knowledge.

## I.    INTRODUCTION

2.    **Synopsis.** In an effort to increase profits and to obtain an unfair advantage over its lawfully acting competitors, Defendant falsely and misleadingly advertises, labels, and packages certain of its ZzzQuil™ brand Nighttime Sleep Aid products that contain Diphenhydramine (the "**Products**") as "Non-Habit Forming" (hereinafter, "**Habit Representation**" and/or "**Challenged Representation**"), deliberately leading and coaxing reasonable consumers, including Plaintiffs, to incorrectly believe that the Products do not and cannot cause habitual use. *See infra*, ¶ 4 (Product List); **Exhibit 1** (Product front-labels, displaying the Challenged Representation and identifying Diphenhydramine as one of the active ingredients intended to aid sleep). Fair and accurate depictions of examples of the Products' front-facing labels or packaging, are depicted below with the Challenged Representation called out in red.

 

1

*See also* **Exhibit 1-1 to 1-5** [ZzzQuil™ Nighttime Sleep-Aid Products].




*See also* **Exhibit 1-6 to 1-7** [ZzzQuil™ Nighttime Sleep-Aid Pain Reliever Products].

3.    **The Deception of the Challenged Representation.** The Challenged Representation misleads reasonable consumers, including Plaintiffs, into believing that the Products do not and cannot cause habitual use. In reality, the Products promote habitual use as part of consumers' nightly routine and each Product contains Diphenhydramine HCl ("Diphenhydramine"). Diphenhydramine is an ingredient that can lead consumers to frequently use the Product over a prolonged period, contrary to the Challenged Representation disclaiming the Products' potential to be "habit forming."

SECOND AMENDED CLASS ACTION COMPLAINT

Thus, Defendant's Habit Representation coaxes consumers into using the Products without regard to frequency, resulting in use of the of the Products in a habitual manner. As a result of Defendant's deceptive advertising and marketing practices, consumers, including Plaintiffs, are overpaying a premium for "non-habit-forming" sleep aid products that, in fact, induce habitual use.

4.    Through falsely, misleadingly, and deceptively labeling, packaging, and advertising the Products with the Challenged Representation, Defendant sought to take advantage of consumers' desire, perceived value, and willingness to pay more for "healthier" and "safer" sleep-aids that do not pose a risk of forming a habit. In this way, Defendant has charged consumers a premium for habit-forming products falsely advertised and warranted as "***Non-Habit Forming***," while reaping the financial benefits. Defendant has done so at the expense of unwitting consumers, as well as Defendant's lawfully acting competitors who also sell sleep aids with active ingredient Diphenhydramine but do not falsely label their products "non habit forming" given the science demonstrating a risk of habit formation, giving Defendant an unfair competitive advantage. Accordingly, Defendant's Habit Representation is misleading and deceptive, and therefore unlawful.

5.    **The Products.** The products at issue are the ZzzQuil™ brand Nighttime Sleep Aid products, which are labeled with the Challenged Representation, contain the active ingredient Diphenhydramine, and are sold to consumers in California or the United States during the applicable statutes of limitations, regardless of the Products' form, size, or variations—such as liquid volume or pill count, multi or single pack, flavors, or additional features (like pain treatment or alcohol free) (collectively referred to herein and throughout this complaint as the "**Products**"). The Products include, but are not necessarily limited to, the following product lines, products, sizes, or variations:

(A)    ZzzQuil™ *Nighttime Sleep-Aids,* in all variations, sizes, or forms, including

(1) Liquid, Alcohol-Etc. Free, Soothing Berry, including (a) 12 oz (*see* **Exhibit 1-1A**);

(2) Liquid, Calming Vanilla Cherry, including (a) 12 oz (single pack) and (b) 12 oz (2-pack) (*see* **Exhibit 1-2A to Exhibit 1-2B**);

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

(3) Liquid, Soothing Mango Berry, including (a) 6oz (single pack) and (b) 12 oz (single pack) (*see* **Exhibit 1-3A to Exhibit 1-3B**);

(4) Liquid, Warming Berry, including (a) 1 oz. (single pack); (b) 1 oz (8-pack); (c) 4 oz (single pack); (d) 6 oz (single pack); (e) 12 oz (single pack); (f) 12 oz (2-pack); and (g) 12 oz (3-pack) (*see* **Exhibit 1-4A to Exhibit 1-4G**); and

(5) Pills (Liquid Capsules), including (a) 2 LiquiCaps (single pack); (b) 2 LiquiCaps (2-pack); (c) 6 LiquiCaps (single pack); (d) 6 LiquiCaps (2-pack); (e) 8 LiquiCaps (single pack); (f) 8 LiquiCaps (2-pack); (g) 12 LiquiCaps (single pack); (h) 12 LiquiCaps (2-pack); (i) 24 LiquiCaps (single pack); (j) 24 LiquiCaps (2-pack); (k) 24 LiquiCaps (3-pack); (l) 36 LiquiCaps (single pack); (m) 36 LiquiCaps (2-pack); (n) 48 LiquiCaps (single pack), (o) 72 LiquiCaps (single pack), (p) 96 LiquiCaps (single pack) (*see* **Exhibit 1-5A to Exhibit 1-5P**)

(*see* **Exhibit 1-1 to 1-5** [Product Images for ZzzQuil™ *Nighttime Sleep-Aids*]); and

(B) ZzzQuil™ Nighttime Sleep-Aid Pain Reliever, in all variations, sizes, or forms, including

(6) Liquid, Black Cherry, including (a) 12 oz (single pack) and (b) 12 oz (2-pack) (*see* **Exhibit 1-6A to Exhibit 1-6B**);

(7) Liquid, Midnight Berry, including (a) 12 oz (single pack) and (b) 12 oz (2-pack) (*see* **Exhibit 1-7A to Exhibit 1-7B**); and

(8) Pills (Gel Tablets), including (a) 60 count (*see* **Exhibit 1-8A**)

(*See* **Exhibit 1-6 to 1-7** [Product Images for ZzzQuil™ *Nighttime Sleep-Aids Pain Reliever*]).

6. **Primary Dual Objectives**. Plaintiffs bring this action individually and in a representative capacity on behalf of those similarly situated consumers who purchased the Products during the relevant Class Period (Class and/or Subclasses defined infra), for dual primary objectives: ***One***, Plaintiffs seek, on behalf of themselves and the Class/Subclasses, a monetary recovery of the price premium Plaintiffs and consumers overpaid for Products that should, but fail to, comport with

4

SECOND AMENDED CLASS ACTION COMPLAINT

the Challenged Representation (which may include, for example, damages, restitution, disgorgement, and/or any applicable penalties, fines, or punitive/exemplary damages) solely to the extent that the causes of action pled herein permit such recovery. *Two*, Plaintiffs seek, on behalf of themselves and the Class/Subclasses, injunctive relief to stop Defendant's unlawful manufacture, marketing, and sale of the Products with the Challenged Representation to avoid or mitigate the risk of deceiving the public into believing that the Products conform to the Challenged Representation, by requiring Defendant to change its business practices, which may include one or more of the following: removal or modification of the Challenged Representation from the Products' labels and/or packaging, removal or modification of the Challenged Representation from the Products' advertising, modification of the Product's formulation be it a change in ingredients or their sourcing and manufacturing processes, and/or discontinuance of the Product's manufacture, marketing, and/or sale.

## II.   JURISDICTION

7.     This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## III.   VENUE

8.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. Specifically, Plaintiff Sneed purchased the unlawful Products in this District, and Defendant has deliberately marketed, advertised, and sold the Products within this District using the Challenged Representation.

## IV.   PARTIES

### A.   Plaintiffs

9.     **Plaintiff Stephen Sneed.** The following is alleged based upon Plaintiff Sneed's personal knowledge:

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

a. **Residence**. Plaintiff Sneed is, and at all relevant times hereto was, an individual residing in the state of California.

b. **Purchase Details**. Plaintiff Sneed purchased the ZzzQuil™ Nighttime Sleep-Aid, Liquid (Calming Vanilla Cherry, 12 oz) (the "**Sneed Purchased Produc**t") for approximately $12.00 at a CVS store in Berkeley, California, in or around Winter of 2022.

c. **Reliance on and Perception of Challenged Representation.** In making the purchase, Plaintiff Sneed read the Challenged Representation on the Product's label or packaging, leading Plaintiff Sneed to believe that the Product does not and cannot cause habitual use—i.e., does not pose a risk of frequent use over prolonged periods.

d. **Developed Habit from Using the Product**. After using the Product, Plaintiff formed a habit of relying on it to fall asleep.

e. **No Actual Knowledge of Falsity**. At the time of purchase, Plaintiff Sneed did not know that the Challenged Representation was false—i.e., that the Product can or do cause habitual use—i.e., the Products' use may lead to frequent use over prolonged periods.

f. **No Notice of Contradictions.** Plaintiff Sneed did not notice any disclaimer, qualifier, or other explanatory statement or information on the Product's labels or packaging that contradicted the prominent Challenged Representation or otherwise suggested that the Products would or may cause habitual use.

g. **Causation/Damages**. Plaintiff Sneed would not have purchased the Product, or would not have paid as much for the Product, had Plaintiff Sneed known that the Challenged Representation was false—i.e., that the Products can or do cause habitual use.

h. **Desire to Repurchase.** Plaintiff Sneed continues to see the Products available for purchase and desires to purchase them again if the Challenged Representation was in fact true.

i. **Lack of Personal Knowledge/Expertise to Determine Truth**. Plaintiff Sneed does not personally know whether the Products or diphenhydramine can lead to frequent use over prolonged periods, or the psychological impacts of sleep aides and whether they can or cannot lead users to habitually use them. Plaintiff Sneed does not possess any specialized knowledge, skill, experience, or education in sleep-aid products, similar to and including the active or inactive ingredients used in the Products at issue. Thus, Plaintiff Sneed has no way of determining whether the Challenged Representation on the Products is true.

j. **Inability to Rely**. Plaintiff Sneed is, and continues to be, unable to rely on the truth of the Challenged Representation on the Products' labels.

10. **Plaintiff Nickolas Cannon.** The following is alleged based upon Plaintiff Cannon's personal knowledge:

a. **Residence**. Plaintiff Cannon is, and at all relevant times hereto was, an individual residing in the state of California.

SECOND AMENDED CLASS ACTION COMPLAINT

b. **Purchase Details**. Plaintiff Cannon purchased the ZzzQuil™ Nighttime Sleep-Aid Pills (Liquid Capsules) (the "**Cannon Purchased Product**") for approximately $15.00 at a Walmart store in Orangevale, California, in or around February 2023.

c. **Reliance on Challenged Representation.** In making the purchase, Plaintiff Cannon read the Challenged Representation on the Product's label or packaging, leading Plaintiff Cannon to believe that the Product does not and cannot cause habitual use—i.e., does not pose a risk of frequent use over prolonged periods.

d. **Developed Habit from Using the Product**. After using the Product, Plaintiff formed a habit of relying on it to fall asleep.

e. **No Actual Knowledge of Falsity**. At the time of purchase, Plaintiff Cannon did not know that the Challenged Representation was false—i.e., that the Product can or do cause habitual use—i.e., the Products' use may lead to frequent use over prolonged periods.

f. **No Notice of Contradictions.** Plaintiff Cannon did not notice any disclaimer, qualifier, or other explanatory statement or information on the Product's labels or packaging that contradicted the prominent Challenged Representation or otherwise suggested that the Products would or may cause habitual use.

g. **Causation/Damages**. Plaintiff Cannon would not have purchased the Product, or would not have paid as much for the Product, had Plaintiff Cannon known that the Challenged Representation was false—i.e., that the Products can or do cause habitual use.

h. **Desire to Repurchase.** Plaintiff Cannon continues to see the Products available for purchase and desires to purchase them again if the Challenged Representation was in fact true.

i. **Lack of Personal Knowledge/Expertise to Determine Truth**. Plaintiff Cannon does not personally know whether the Products or diphenhydramine can lead to frequent use over prolonged periods, or the psychological impacts of sleep aides and whether they can or cannot lead users to habitually use them. Plaintiff Cannon does not possess any specialized knowledge, skill, experience, or education in sleep-aid products, similar to and including the active or inactive ingredients used in the Products at issue. Thus, Plaintiff Cannon has no way of determining whether the Challenged Representation on the Products is true.

j. **Inability to Rely**. Plaintiff Cannon is, and continues to be, unable to rely on the truth of the Challenged Representation on the Products' labels.

11. **Plaintiffs' Future Harm**. Defendant continues to advertise, market, and sell the Products with the Challenged Representation. Plaintiffs would like to purchase the Products in the future if they lived up to and conformed with the Challenged Representation. However, Plaintiffs are average consumers who are not sophisticated in the chemistry, manufacturing, formulation, and psychological impacts of sleep-aid products. Indeed, Plaintiffs do not have any personal knowledge regarding active ingredients and the formulations of the Products. Thus, Plaintiffs cannot accurately differentiate between active ingredients in sleep-aid products that pose a risk of habitual use and

SECOND AMENDED CLASS ACTION COMPLAINT

those which do not and cannot. Since Plaintiffs desire to purchase the Products again to obtain the benefits of the Challenged Representation—despite the fact that the Products were once marred by false advertising or warranties—Plaintiffs would likely and reasonably, but incorrectly, assume the Products are true to and conform with the Challenged Representation on their labels, packaging, and Defendant's advertisements, including Defendant's website and social media platforms. Accordingly, Plaintiffs are at risk of reasonably, but incorrectly, assuming that Defendant has fixed the Products such that Plaintiffs may buy them again, believing they are no longer falsely advertised and warranted and instead believing that they comply with the Challenged Representation. In this regard, Plaintiffs are currently and in the future deprived of the ability to rely on the Challenged Representation to purchase the Products.

**B.     Defendant**

12.     **Defendant Procter & Gamble Company ("Defendant" and/or "P&G")** is a corporation headquartered and/or maintaining its principal place of business in the State of Ohio. Defendant was doing business in the State of California at all relevant times. Directly and through its agents, Defendant has substantial contacts with and receives substantial benefits and income from and through the State of California, as well as the United States of America. Defendant is one of the owners, manufacturers, and/or distributors of the Products, and is one of the companies that created and/or authorized the false, misleading, and deceptive labeling of the Products. Defendant and its agents promoted, marketed, and sold the Products at issue in this jurisdiction and within this judicial district. The unfair, unlawful, deceptive, and misleading Challenged Representation on the Products were prepared, authorized, ratified, and/or approved by Defendant and its agents, and were disseminated throughout California and the nation by Defendant and its agents to deceive and mislead consumers in the State of California and the United States into purchasing the Products.

**V.     FACTUAL ALLEGATIONS**

**A.     Background and the Rise of the Sleep-Aid Market**

13.     **Consumer Demand for Sleep-Aid Products**. Millions of Americans suffer without a good night's sleep. According to the CDC, more than one third of American adults are not getting

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

enough sleep regularly.[1] Insufficient sleep is a prominent and pervasive problem in today's society and is linked to depression, ADHD, obesity, Type 2 diabetes, cardiovascular disease, cancer, depression, and Alzheimer's.[2] Thus, consumers turn to sleep-aid products in search for sleep, which has become a "cultural obsession—fueling the rise of an entire industry."[3]

14.    Furthermore, 41 percent of those using an OTC sleep aid used the drugs for a year or longer.[4] Extrapolated to the greater U.S. population, these numbers indicate that nearly 10 million consumers habitually use sleep-aid Products.[5] In a more recent study of 2,006 adults in the United States conducted in 2021 by the American Academy of Sleep Medicine ("**AASM**"), 51 percent reported using a sleep aid, and 53 percent reported that they used the aid "often" to fall asleep, with only 5 percent reporting that they relied on a sleep aid "rarely."[6] Therefore, the sleep aid market has become a global juggernaut, reaping in nearly $65 billion a year, a number which is only continuing

[1] *1 in 3 Adults Don't Get Enough Sleep,* CDC, available at https://www.cdc.gov/media/releases/2016/p0215-enough-sleep.html (last visited May 24, 2023); *Sleeping Aids Market Share, Size, Trends, Industry Analysis Report, By Product (Mattresses & Pillows, Sleep Laboratories, Medications, Sleep Apnea Devices); By Sleep Disorders; By Region; Segment Forecast, 2022-2030,* POLARIS MARKET RESEARCH (June 2022), available at https://www.polarismarketresearch.com/industry-analysis/sleeping-aids-market (last visited May 24, 2023) (noting that 50-70 million Americans suffer from lack of sleep and often turn to sleep-aid products).

[2] *See* Kristen L. Knutson, et. al, *Role of Sleep Duration and Quality in the Risk and Severity of Type 2 Diabetes Mellitus,* 116 Arch Intern Med 1768 (Sept. 18, 2006), available at https://pubmed.ncbi.nlm.nih.gov/16983057/ (last visited May 31, 2023) (linking sleep loss to increased diabetes risk); Patrick H. Finan, et. al, *The Effects of Sleep Continuity Disruption on Positive Mood and Sleep Architecture in Healthy Adults,* 38 Sleep 1735 (2015), available at https://gwern.net/doc/zeo/2015-finan.pdf (last visited May 31, 2023) (sleep deprivation and disruption can lead to a decrease in positive mood); Vijay K. Chattu, et. al. *The Global Problem of Insufficient Sleep and Its Serious Public Health Implications,* 7 Healthcare 1, 9-10 (2019), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6473877/ (last visited May 31, 2023) ("[g]ood sleep is necessary for good physical and mental health and a good quality of life"); *Sleep and Chronic Disease,* Centers for Disease Control and Prevention, available at https://www.cdc.gov/sleep/about_sleep/chronic_disease.html (last visited May 31, 2023) (linking the risk of diabetes, cardiovascular disease, obesity, and depression to insufficient sleep); Neil Howe, *America The Sleep-Deprived,* Forbes (Aug. 18, 2017), available at https://www.forbes.com/sites/neilhowe/2017/08/18/america-the-sleep-deprived/?sh=684e9c611a38 (last visited May 24, 2023).

[3] *See* Howe, *supra* note 2.

[4] *Id.*

[5] *Id.*

[6] *AASM Sleep Prioritization Survey: Sleep Aid Use,* AMERICAN ACADEMY OF SLEEP MEDICINE (2021), available at https://aasm.org/wp-content/uploads/2021/04/sleep-prioritization-survey-2021-sleep-aid-use.pdf (last visited May 24, 2023).

9

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

to rise.[7] Notably, North America accounts for the highest purported market share.[8] Utilizing the above statistics on the amount of people who use sleep aids, combined with Defendant's market share, at least 5.3 million Americans are consuming Defendant's Products on a daily basis (in other words, habitually).[9] In fact, a 2015 Consumer Reports survey of 4,023 adults found that 20 percent of participants reported use of over-the-counter ("**OTC**") medication in the last year to improve sleep.[10] Of those, almost 18 percent reported that they took OTC sleep-aids daily.[11]

15.    **Diphenhydramine Causes Dopamine Release Creating Dependency.** Consumer Reports further reported that based on a 2008 study by Gianluigi Tanda, et. al, titled "Cocaine-Like Neurochemical Effects of Antihistaminic Medications," diphenhydramine, a common ingredient in over-the-counter sleep aids like the Products, have habit-forming properties.[12] Beyond what the Consumer Reports article shares, the study compared different classes of drugs abused by humans, including psychostimulants (e.g., cocaine, amphetamine) and other abused drugs (e.g., opioids, nicotine, cannabinoids), to diphenhydramine, and found a similar pattern of greater activation of dopamine transmission.[13] The study provides a strong neurobiological basis underlying the cocaine-like behavioral effects observed with these compounds like diphenhydramine, and the occasional misuse of over-the-counter antihistamine medications.[14] Diphenhydramine increased dopamine

---

[7] *See supra* note 1, *Sleeping Aids Market Share, Size, Trends, Industry Analysis Report*.
[8] *Id.* ("This huge market share can be attributed to the high prevalence of sleeping disorders.").
[9] Ginger Skinner, *Can You Get Hooked on Over-the-Counter Sleep Aids?*, CONSUMER REPORTS (Dec. 29, 2016), available at https://www.consumerreports.org/drugs/over-the-counter-sleep-aids-can-you-get-hooked/ (last visited Jan. 25, 2023).; *See also*, *Market Share of Leading Sleep Aid Liquid Brands*, STATISTA (Aug. 2019), available at https://www.statista.com/statistics/1052350/market-share-of-leading-sleeping-aid-liquid-brands-us/ (last visited Jan. 25, 2023) ("In 2019, the ZzzQuil brand had a share of 57 percent in the sleeping aid liquid market in the United States").
[10] Ginger Skinner, *Can You Get Hooked on Over-the-Counter Sleep Aids?*, CONSUMER REPORTS (Dec. 29, 2016), available at https://www.consumerreports.org/drugs/over-the-counter-sleep-aids-can-you-get-hooked/ (last visited May 24, 2023).
[11] *Id.*
[12] *Id.*; Gianluigi Tanda, et. al, *Cocaine-Like Neurochemical Effects of Antihistaminic Medications*, 106 J. Neurochem 147 (Jul. 1, 2008) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6741778/).
[13] *Id.*
[14] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT

transmission most similarly among the antihistamines tested, meaning it had the highest similarity to the pattern of activation to psychostimulants like cocaine.[15]

16.    Because mice and rats are biologically similar to humans, they provide "excellent" animal models for studying human physiology.[16] Mice and rats share 95 percent of their genes with humans, have similar immune systems, and obtain similar diseases for many of the same genetic reasons.[17] Rats are also similar to humans in how the brain interprets rewards and habit formation.[18] Because of this, mice and rats serve as primary model systems for studying human pathophysiology in clinical settings.[19]

17.    **Consumer Demand for Non-Habit-Forming Sleep Aids.** Because of the prevalent use of sleep-aids, consumers desire products that are safe and do not contain significant side effects.[20] Specifically, consumers prefer and desire sleep-aid products that cannot and do not cause habitual use.[21] Thus, consumers turn to natural alternatives and products that are marketed and advertised as non-habit forming.[22]

**B.    Defendant's Brand Strategy and Marketing Campaign**

18.    **Brand Strategy/Marketing Campaign.** Defendant deliberately created and executed a marketing campaign to distinguish the ZzzQuil™ brand products from their competitors, as a brand and company that manufactures sleep-aid products that are "Non-Habit Forming." Not only does Defendant label the Products' packaging with the Challenged Representation—"Non-Habit Forming"—but Defendant has also heavily advertised its Products as being "non-habit-forming."

---

[15] *Id.*

[16] Elizabeth C. Bryda, *The Mighty Mouse: The Impact of Rodents on Advances in Biomedical Research*, 110 Missouri Med. 207-11 (2013).

[17] *Id.*

[18] Bart Ellenbroek & Jiun Youn, *Rodent Models in Neuroscience Research: Is it a Rat Race?* 9 Dis. Model Mech. 1079-1087 (Oct. 1, 2016), (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5087838/).

[19] *Id.*

[20] Eric Suni, et. al, *Sleep Aids*, SLEEP AIDS (Oct. 5, 2023), available https://www.sleepfoundation.org/sleep-aids (last visited Oct. 23, 2023).

[21] Eric Suni, et. al, *Natural Sleep Aids*, SLEEP AIDS (Oct. 5, 2023), available https://www.sleepfoundation.org/sleep-aids/natural-sleep-aids#:~:text=Many%20customers%20prefer%20natural%20sleep%20supplements%20because%20they,about%20the%20addictive%20potential%20of%20prescription%20sleep%20aids (last visited Oct. 23, 2023).

[22] *See generally id.*

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

11

SECOND AMENDED CLASS ACTION COMPLAINT

Defendant maintains a ZzzQuil™ website, and several ZzzQuil™ social media accounts—all designed to promote the brand, as well as market the Products, in line with Defendant's brand strategy, as "non-habit-forming" to convince consumers that Defendant's ZzzQuil™ brand Products, at issue here, will not result in habitual use.

19.    Consistent with the science demonstrating diphenhydramine is habit forming, other sleep aids containing this same active ingredient, which are manufactured and sold by Defendant's competitors, do not feature the misleading "Non-Habit Forming" label, as shown below. By falsely labeling their product as "Non-Habit Forming," Defendant is exploiting vulnerable consumers who are seeking relief from sleep difficulties, giving them a false sense of safety and security based on its "non-habit forming" representation. This deceptive labeling not only takes advantage of these consumers but also provides Defendant with an unfair competitive advantage over other companies offering similar products with the same active ingredient, who refrain from making such misleading claims.

 

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265




20. **Challenged Representation on Products' Labels.** Defendant falsely and misleadingly labels the Products with the Challenged Representation: "Non-Habit Forming" as depicted below.



The Challenged Representation on the Products' packaging is conspicuous and designed to grab the consumer's attention.

    a. **Placement.** The Challenged Representation is prominently placed on the center of each Products' primary display panel of the front label or packaging immediately underneath the Products' name.

    b. **Sparsity.** The Challenged Representation is not hidden in a sea of information; rather, the front display panel contains scant information about the Products, largely limited to the brand name (ZzzQuil), identity of the product line (e.g., Nighttime Sleep-Aid and Pain Reliever) and size or count (e.g., 12 oz or 24 liquicaps). *See* **Exhibit 1** [Product Images].

    c. **Typeface.** The Challenged Representation stands out from the scant information contained on the front panel, prominently displayed with a bold and large typeface, clear and legible font, and highly visible letters that starkly contrast with the Products' background. *See* **Exhibit 1** [Product Images].

SECOND AMENDED CLASS ACTION COMPLAINT

21.    In this way, Defendant uses the carefully designed labels and packaging, including the Challenged Representation's placement, repetition, and typeface, alongside the sparsity of competing information, to perpetuate the false notion that the Products are "non-habit-forming." The net-effect or net-impression of consumers viewing the Products' labels or packaging is that the Products are "non-habit-forming."

### C.    Falsity of the Challenged Representations

22.    **Falsity of the Challenged Representation.** Although each of the Products at issue is marketed with the Challenged Representation, the Products, specifically Diphenhydramine (an ingredient used in the Products), can cause habitual use. Habitual use of the Products containing Diphenhydramine creates a risk of misuse.

23.    **APA Definition of "Habit".** The American Psychological Association ("**APA**") defines habit as "well-learned behavior or automatic sequence of behaviors that is relatively situation specific and over time has become motorically reflexive and independent of motivational or cognitive influence---that is, it is performed with little or no conscious intent."[23] Habits formed through repetition of behavior in specific contexts and are automatically triggered as a response to contextual clues that have been associated with their performance and are formed through a psychological pattern commonly known as the "habit loop."[24]

24.    **APA Definition of "Habit-Forming".** The APA defines habit-forming as "the process by which, through repetition or conditioning, animals or humans acquire a behavior that becomes regular and increasingly easy to perform."[25]

25.    **Medical Understanding of Drug Habituation.** Drug Habituation (e.g., habit of using a substance) results from the repeated consumption of a drug. The characteristics of this includes: a desire (but not a compulsion) to continue using a drug or substance for the sense of improved well-

---

[23] APA Dictionary of Psychology "Habit", AMERICAN PSYCHOLOGICAL ASSOCIATION, available at https://dictionary.apa.org/habit (last visited May 24, 2023).
[24] Phillipa Lally, Cornelia H. M. Van Jaarsveld, Henry W. W. Potts, & Jane Wardle, *How are habits formed: Modelling habit formation in the real world*, EUROPEAN JOURNAL OF SOCIAL PSYCHOLOGY, 40, 998–1009 (July 16, 2009), available at https://sci-hub.ru/10.1002/ejsp.674 (last visited May 24, 2023); *Habit Formation*, Psychology Today, available at https://www.psychologytoday.com/us/basics/habit-formation (last visited May 24, 2023).
[25] APA Dictionary of Psychology "Habit Formation", AMERICAN PSYCHOLOGICAL ASSOCIATION, available at https://dictionary.apa.org/habit-formation (last visited Jan. 25, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

being and a degree of psychic dependence on the effect of the drug or substance (but absence of physical dependence).[26]

26.    **Bedtime Routines and Habit Formation.** Most people have a bedtime routine to assist with regular and quality sleep patterns. Data from the CDC shows that more than 8 percent of adults take a sleep aid more than four times a week as a part of their bedtime routine to help fall or stay asleep.[27] Decades of psychological research demonstrate that repetition of a simple action (such as taking a sleep aid like the Product) in a consistent context (before going to bed) leads to the action being activated upon subsequent exposure to those external cues (that is, habitually). This is the case, and such habit is likely to persist, even after conscious attention, motivation, or interest is reduced or dissipates.[28]

27.    **Habit is Not Addiction.** Habit is not the same as addiction. A habit does not require any drug blunting effect or physical dependence to form, like an addiction requires (i.e., increase in user's physical tolerance to the drug whereby more of the drug is needed to create the same effect). "Habits are a lesser form of addiction: [t]he more you engage in the past, the more likely you are to engage today."[29] Habitual behavior in relation to drug-taking habits is characterized as "behavior that has been automatized, highly stimulus bound, inflexible, and insensitive to the associated

---

[26] *Expert Committee on Addiction-Producing Drugs (Seventh Report)*, World Health Organization, No. 116 (1957), available at https://apps.who.int/iris/bitstream/handle/10665/40371/WHO_TRS_116.pdf?sequence=1 (last visited May 24, 2023).

[27] Cynthia Reuben, *Morbidity and Mortality Weekly Report: QuickStats: Percentage of adults aged ≥18 years who took medication to help fall or stay asleep four or more times in the past week, by sex and age group — National Health Interview Survey, United States, 2017–2018*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Dec. 13, 2019), available at: https://www.cdc.gov/mmwr/volumes/68/wr/mm6849a5.htm (May 25, 2023).

[28] Benjamin Gardner, et al., *Making health habitual: the psychology of 'habit-formation' and general practice.* 62 BRITISH JOURNAL OF GENERAL PRACTICE 664, 664 (Dec. 2012), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3505409/ (last visited Jan. 27, 2023); *see also* Peter J. Bayley, et al., *Robust habit learning in the absence of awareness and independent of the medial temporal lobe.* 436 NATURE 550, 550 (May 4, 2006) available at https://ncbi.nlm.nih.gov/pmc/articles/PMC1457096/ (last visited Jan. 27, 2023).

[29] Carmen Nobel, *How to Get People Addicted to a Good Habit*, Forbes (Jan. 27, 2018), available at https://www.forbes.com/sites/hbsworkingknowledge/2018/01/27/how-to-get-people-addicted-to-a-good-habit/?sh=303d718c7472 (last visited June 1, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT

outcomes (positive or negative)."[30] The role of habituation is an "important contribution . . . to our understanding of chronic relapsing drug use."[31]

28.    **Diphenhydramine and Risk of Habitual Use.** Diphenhydramine is the active ingredient in all the Products. Diphenhydramine users are at risk of habitually using the Products,[32] as daily use and overuse is common.[33] Specifically, the Products are used in a situation-specific context, where consumers incorporate them into a bedtime routine that becomes more motorically reflexive and less dependent on motivational or cognitive influence. Indeed, consumers repeated use of the Products is likely to occur without their conscious awareness as the "non-habit forming" representation lulls them into a false sense of safety . Medication that provides a feeling of relaxation, sedation, wellbeing, or euphoria is more likely to be habit-forming.

29.    **Diphenhydramine and Risk of Misuse.** The habitual use of diphenhydramine creates a risk of misusing products containing the ingredient.[34] The high potential for misuse stems from the development of a tolerance to diphenhydramine and an onslaught of withdrawal symptoms that worsen with prolonged use.[35] Diphenhydramine blocks the action of acetylcholine, a

---

[30] Zsuzsika Sjoerds, et al., *The role of habits and motivation in human drug addiction: a reflection*, 5 Front Psychiatry 1, 1 (Jan. 29, 2014), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3905212/pdf/fpsyt-05-00008.pdf (last visited Sept. 5, 2024).

[31] *Id.* at 2.

[32] Skinner, *supra* note 10.

[33] Antonia Nemanich, et al., *Increased rates of diphenhydramine overdose, abuse, and misuse in the United States, 2005–2016*, 59 Clinical Toxicology 1, 1 (Mar. 10, 2021), available at https://www.tandfonline.com/doi/full/10.1080/15563650.2021.1892716 (last visited Sept. 5, 2024).

[34] Jagroop S. Saran, et al., *Chronic diphenhydramine abuse and withdrawal*, 7 Neurology: Clinical Practice 439, 439 (Oct. 2017), available at https://www.neurology.org/doi/10.1212/CPJ.0000000000000304 (last visited Sept. 5, 2024); David F. Craig & Clive S. Mellor, *Dimenhydrinate dependence and withdrawal*, 142 Can. Med. Assoc. J. 970, 970 (May 1, 1990), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1451752/pdf/cmaj00214-0060.pdf (last visited Sept. 5, 2024); Fabrizio Schifano, et al., *Focus on Over-the-Counter Drugs' Misuse: A Systematic Review on Antihistamines, Cough Medicines, and Decongestants*, 12 Frontiers in Psychiatry 1, 9 (May 7, 2021), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8138162/ (last visited Sept. 5, 2024).

[35] Saran, *supra* note 36, at 440.

SECOND AMENDED CLASS ACTION COMPLAINT

neurotransmitter involved in various bodily functions.[36] The drug inhibits the reuptake of serotonin, another neurotransmitter affecting mood regulation, contributing to misuse as individuals seek the familiar pattern of its sedating and hallucinogenic effects.[37] Frequent use of diphenhydramine develops tolerance to the drug that makes it difficult to stop without facing withdrawal symptoms.[38] Cases documenting the severe effects of diphenhydramine dependence illustrate the risk undertaken by consumers who purchase a product containing the ingredient.[39] From 2005 to 2016, there was a reported 63 percent increase in intentional exposure to diphenhydramine.[40] The decade long study found that adults over 55 had a 230% increase in rates of diphenhydramine misuse.[41] The pharmacological properties of diphenhydramine commonly induce habitual misuse and dependence. And the alarming probability for addiction arises from the Product's non-habit-forming representations suggesting that consumers are not at risk.

**D.    Plaintiffs' Expert Confirms Diphenhydramine Is Habit Forming**

30.    Plaintiffs have retained Dr. Antonia Nemanich, a highly qualified Medical Toxicologist and Emergency Physician, as an expert to evaluate the claims regarding the habit-forming nature of diphenhydramine. *See* attached hereto the Declaration of Antonia Nemanich, MD, at ¶ 3.

---

[36] Antonia Nemanich, et al., *Increased rates of diphenhydramine overdose, abuse, and misuse in the United States, 2005–2016*, 59 Clinical Toxicology 1002, 1002 (Mar. 10, 2021), available at https://www.tandfonline.com/doi/full/10.1080/15563650.2021.1892716 (last visited Sept. 5, 2024).

[37] *Id.*

[38] Paula K. Schweitzer, et al., *Sleepiness and performance during three-day administration of cetirizine or diphenhydramine*, 94 J. Allergy Clinical Immunology 716, 722 (Oct. 1994), available at https://pubmed.ncbi.nlm.nih.gov/7930305/ (last visited Sept. 5, 2024).

[39] Anne Roussin, et al., *Misuse and Dependence on Non-Prescription Codeine Analgesics or Sedative H1 Antihistamines by Adults: A Cross-Sectional Investigation in France*, 8 PLOS ONE 1, 1 (Oct. 3, 2013), available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0076499 (last visited Sept. 5, 2024); Caroline Bonham & Florian Birkmayer, *Severe Diphenhydramine Dependence and Withdrawal: Case Report*, 5 J. Dual Diagnosis 97, 101—102 (Jan. 20, 2009), available at https://www.tandfonline.com/doi/abs/10.1080/15504260802620269 (last visited Sept. 5, 2024).

[40] Antonia Nemanich, Erica Liebelt, & Amber K. Sabbatini, *Increased Rates of Diphenhydramine Overdose, Abuse, and Misuse in the United States, 2005–2016*. 59 Clinical Toxicology 1002, 1004 (Feb. 2021) available at https://docslib.org/doc/12853967/increased-rates-of-diphenhydramine-overdose-abuse-and-misuse-in-the-united-states-2005-2016 (last visited Sept. 4, 2024).

[41] *Id*. at 1005.

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

31.   Dr. Nemanich has extensive experience in treating patients with substance dependence and use disorders. *Id.* ¶ 3. She holds prominent positions at Rush University medical Center, including Assistant Professor of Emergency Medicine and Medical Toxicology, and Director of Toxicology Education. *Id.* Dr. Nemanich regularly consults for the Illinois Poison Center, and her clinical practice includes caring for patients suffering from both acute toxicity and chronic substance dependence, including those habitually using diphenhydramine. *Id.* ¶ 4.

32.   Dr. Nemanich opines that diphenhydramine is inherently habit-forming when used regularly,[42] contrary to the "non-habit forming" label on the Products. *Id.* ¶ 9. In her clinical experience, she has treated several patients who developed habitual use of diphenhydramine, including those who have increased their doses due to tolerance. *Id.* ¶ 4.

33.   According to Dr. Nemanich, the sedative effects of diphenhydramine, combined with its ability to include feelings of relaxation and well-being, make it prone to habitual use even without physical addiction. *Id.* ¶ 6. She emphasizes that the rapid development of tolerance, as demonstrated in studies where participants experienced diminished sedative effects after just four days,[43] encourages repeated use. *Id.* ¶ 9.

34.   Dr. Nemanich has treated several patients who met the criteria for dependence and use disorder based on their pattern of diphenhydramine use. *Id.* These patients did not set out to misuse the medication but sought it out as a treatment for insomnia. *Id.* Over time, they began taking escalating doses due to the tolerance factor and had significant difficulty stopping the medication. *Id.*[44]

---

[42] GS Richardson, et. al, *Tolerance to Daytime Sedative Effects of H1 Antihistamines* 22, J. of Clin. Pharm. 511-515 (Oct. 2022); Chen TY, et al., Diphenhydramine dependence through deep intramuscular injection resulting in myonecrosis and prolonged QT c interval, 39 J. Clin. Pharm. Therapeutics 325-327 (2014).

[43] *Id.*

[44] Dinndorf PA, McCabe MA, Frierdich S., *Risk of abuse of diphenhydramine in children and adolescents with chronic illnesses*, 133 J. Pediatrics 293-295 (Aug. 1998); Nolen A, Dai T., *Diphenhydramine Use Disorder and Complicated Withdrawal in a Palliative Care Patient*, 23 J. of Palliative Med. 1279-1282 (Sept. 2020); Saran, *supra* note 36; Thomas A, Nallur DG, Jones N, Deslandes PN., *Diphenhydramine abuse and detoxification: a brief review and case report*, 23 J. Psychopharmacology. 101-105 (Jan. 2009).

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

35.   Dr. Nemanich further emphasizes that unlike taking diphenhydramine for an allergic reaction, a condition that usually resolves itself within a few days, insomnia is often chronic. *Id.* ¶ 10.[45] Consumers are not expected to have the knowledge that the medication may become less effective or habit forming with prolonged use, and may reasonably believe that they can use a sleep aid labeled "non-habit forming" daily without risk of tolerance or dependence. *Id.* ¶ 9.[46]

36.   Dr. Nemanich concludes that the pharmacological properties of diphenhydramine, including its ability to induce tolerance and its effects on mood and sedation, position it as a substance with significant potential for habitual use. *Id.* ¶¶ 2, 12.

**E.** **Plaintiffs and Reasonable Consumers Were Misled by the Challenged Representation into Buying the Products, to Their Detriment**

37.   **Products.** Defendant manufactures, markets, promotes, advertises, labels, packages, and sells the Products—specifically, ZzzQuil™ Nighttime Sleep Aids, that contain the Challenged Representation on their packaging and labels and contain the ingredient diphenhydramine.

38.   **The Challenged Representation.** On the Products' labeling and packaging, Defendant prominently, conspicuously, and uniformly displays the Challenged Representation—specifically, "Non-Habit Forming" (*see* **Exhibit 1** [Product Images]).

39.   **Reasonable Consumer's Perception.** The Challenged Representation, in isolation or combined with Defendant's pervasive marketing campaign and brand strategy, lead reasonable consumers, like Plaintiffs, into believing the Products conform to the Challenged Representation. More specifically, reasonable consumers interpret the Challenged Representation to mean that the Products are "non-habit-forming"—meaning that the Products do not and cannot cause habitual use—i.e., do not pose a risk of frequent routine use over prolonged periods. This interpretation is not only consistent with the APA's definition and medical understanding of "habit," as described above, but it is also consistent with the ordinary and common usage of the term "habit" defined by various dictionaries, as follows:

---

[45] Tanda, *supra* note 16.
[46] Richardson, *supra* note 53.

SECOND AMENDED CLASS ACTION COMPLAINT

a.  Cambridge Dictionary: "something that you do often and regularly, sometimes without knowing that you are doing it"; "a particular act or way of acting that you tend to do regularly"[47]

b.  Merriam-Webster: "a settled tendency or usual manner of behavior"; "an acquired mode of behavior that has become nearly or completely involuntary"; "a behavior pattern acquired by frequent repetition or physiologic exposure that shows itself in regularity or increased facility of performance"[48]

c.  Collins Dictionary: "A habit is something that you do often or regularly"; "a thing done often and hence, usually, done easily; practice; custom"; "a pattern of action that is acquired and has become so automatic that it is difficult to break"; "a tendency to perform a certain action or behave in a certain way; usual way of doing"; "an acquired behavior pattern regularly followed until it has become almost involuntary"; "customary practice or use"; "a particular practice, custom, or usage"; "a dominant or regular disposition or tendency"[49]

d.  Dictionary.com: "an acquired behavior pattern regularly followed until it has become almost involuntary"; "customary practice or use"; "a tendency or disposition to act in a particular way"; "established custom, usual practice, etc."[50]

e.  Oxford Learners Dictionary: "a thing that you do often and almost without thinking, especially something that is hard to stop doing"; "usual behaviour"[51]

40.  **Materiality.** The Challenged Representation was and is material to reasonable consumers, including Plaintiffs, in deciding to buy the Products—meaning that the Products' "Non-Habit Forming" attribute is important to consumers and motivates them to purchase the Products.

---

[47] Cambridge Dictionary, *Habit*, https://dictionary.cambridge.org/dictionary/english/habit (accessed Oct. 23, 2023).
[48] Merriam-Webster Dictionary, *Habit*, https://www.merriam-webster.com/dictionary/habit (accessed Oct. 23, 2023).
[49] Collins Dictionary, *Habit*, https://www.collinsdictionary.com/dictionary/english/habit (accessed Oct. 23, 2023).
[50] Dictionary.com, *Habit*, https://www.dictionary.com/browse/habit (accessed Oct. 23, 2023).
[51] Oxford Learners Dictionary, *Habit*, https://www.oxfordlearnersdictionaries.com/definition/english/habit (accessed Oct. 23, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT

41.    **Reliance.** The Class, including Plaintiffs, reasonably relied on the Challenged Representation in deciding to purchase the Products.

42.    **Falsity.** The Challenged Representation is false and deceptive because the Products pose a risk of habitual use. Specifically, contrary to Defendant's Habit Representation, the Products promotes habitual use as a part of consumers' nightly routine and Diphenhydramine, an ingredient used in the Products, can lead to frequent use over a prolonged period.

43.    **Consumers Lack Knowledge of Falsity.** Consumers, including Plaintiffs, do not know and have no reason to know, at the time of purchase, that the Challenged Representation was false, misleading, deceptive, and unlawful. That is because consumers, including Plaintiffs, do not work for Defendant and therefore have no personal knowledge of the actual ingredients used to formulate the Products. Additionally, most consumers do not have the specialized knowledge of a chemist or product-developer or a knowledge base of the chemicals and ingredient names and the properties of those ingredients used within the Products. Thus, reasonable consumers, like Plaintiffs, cannot discern from the Products' ingredient disclosures whether ingredients, such as diphenhydramine, are capable of leading habitual use of the Products over a period of time. Furthermore, reasonable consumers, like Plaintiffs, do not ordinarily review subsidiary or fine print information, or information on the back or side panel of products, or review such information on websites. Indeed, studies show that only approximately 7.7% to 11.6% of people even look at a consumer product's side or back label before purchasing the product.[52]

---

[52] Grunert, Klaus, et. al, *Nutrition knowledge, and use and understanding of nutrition information on food labels among consumers in the UK*, 55 APPETITE 177, at 179-181 (2010) available at https://reader.elsevier.com/reader/sd/pii/S0195666310003661?token=95E4146C1BB7D7A7C9A4 87F22F0B445BD44499550086E04870765EBE116ED32DBFE3795E60B69C75831563CD1BC6 655A&originRegion=us-east-1&originCreation=20220720162546 (last visited May 31, 2023) (consumer purchasing behavior study using in-store observation and interview data collection methodology to realistically estimate the degree consumers use nutritional information (found on side/back panels of food product labels and packaging), finding: (1) only 11.6% of respondents, who looked at a product and placed it in their shopping cart, were actually observed looking at the side/back panels of its packaging or labels (panels other than the front panel) before placing it in the cart; (2) of those who looked at the side/back panels, only 31.8% looked at it the product "in detail" (i.e., 3.7% of respondents who looked at the product, looked at side/back panels in detail)); and (3) the respondents self-reported frequency of reviewing side/back panels (for nutritional information) is overreported by 50%when the in-store interview data and observational data are compared); Grunert, Klaus, et. al, *Use and understanding of nutrition information on food labels in six European*

44.   **Defendant's Knowledge.** Defendant knew, or should have known, that the Challenged Representation was false, misleading, deceptive, and unlawful, at the time that Defendant manufactured, marketed, advertised, labeled, and sold the Products using the Challenged Representation to Plaintiffs and the Class. Defendant intentionally and deliberately used the Challenged Representation, alongside its marketing campaign and brand strategy, to cause Plaintiffs and similarly situated consumers to buy the Products believing that the Challenged Representation is true.

a.   **Knowledge of Falsity.** Defendant named and marketed the Products with the Challenged Representation, but Defendant opted to formulate and manufacture them in a manner that does not conform to the representation. Specifically, Defendant named and advertised the Products as "Non-Habit Forming" sleep-aids. However, the Products pose a risk of causing habitual use because they contain diphenhydramine.

b.   **Knowledge of Reasonable Consumers' Perception.** Defendant knew, or should have known, that the Challenged Representation would lead reasonable consumers into believing that the Products would not result in habitual use. Defendant labeled and packaged each of the Products with the Challenged Representation and utilized a long-standing brand strategy to identify the Products as "non-habit-forming." Defendant has an obligation under section 5 of the Federal Trade Commission Act, codified as 15 U.S.C. § 45, to evaluate its marketing claims from the perspective of the reasonable consumer. That means Defendant is statutorily obligated to consider whether the Challenged Representation, be it in isolation or conjunction with its marketing campaign, would mislead reasonable consumers into believing that the Products "non-habit-forming." Thus, Defendant either knew the Challenged Representation is misleading before it marketed the Products to the Class, including Plaintiffs, or Defendant would have known it is deceptive had it complied with its statutory obligations.

c.   **Knowledge of Materiality.** Defendant knew or should have known that the Challenged Representation is material to consumers. ***First***, manufacturers and marketers, like Defendant, generally reserve the front primary display panel of labels

---

*countries*, 18(3) JOURNAL OF PUBLIC HEALTH 261, 261, 263, 266 (2010), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2967247/ (last visited May 31, 2023) (consumer purchasing behavior study using in-store observation and interview data collection methodology to evaluate whether people look at food labels before buying them, where they looked, and how long they looked, finding: (1) respondents spent, on average, approximately 35 seconds, per product, on products they bought; and (2) 62.6% of respondents looked at the front packaging, and only 7.7% looked elsewhere (side/back panels) on the packaging, for products they bought); Benn, Yael, et al., *What information do consumers consider and how do they look for it, when shopping for groceries online*, 89 APPETITE 265, 265, 270 (2015), available at https://www.sciencedirect.com/science/article/pii/S0195666315000422#bib0060 (last visited May 31, 2023) (consumer purchasing behavior study using online eye-movement tracking and recordation, finding: (1) once on the product webpages, respondents tend to look at the pictures of products, rather than examine detailed product information; and (2) by comparison to pictures of products where 13.83-19.07% of respondents fixated, far less fixated on subsidiary information: 4.17% of respondents looked at nutrition information, 3.30% ingredients, 2.97% allergy information, and 0.09% recycling information for example).

SECOND AMENDED CLASS ACTION COMPLAINT

of packaging on consumer products for the most important and persuasive information, which they believe will motivate consumers to buy the products. Here, the conspicuousness of the Challenged Representation on the Products' labels and packaging demonstrates Defendant's awareness of its importance to consumers and Defendant's understanding that consumers prefer and are motivated to buy products that conform to the Challenged Representation. ***Second***, manufacturers and marketers repeat marketing claims to emphasize and characterize a brand or product line, shaping the consumers' expectations, because they believe those repeated messages will drive consumers to buy the Product. Here, the constant, unwavering use of the Challenged Representation on the Products, advertisements, and throughout Defendant's marketing campaign, evidence Defendant's awareness that the falsely advertised Product-attribute is important to consumers. It also evidences Defendant's intent to convince consumers that the Products conform to the Challenged Representation and, ultimately, drive sales.

d. **Defendant's Continued Deception, Despite Its Knowledge.** Defendant, as the manufacturer and marketer of the Products, had exclusive control over the Challenged Representation's inclusion on the Products' labels, packaging, and advertisements— i.e., Defendant readily and easily could have stopped using the Challenged Representation to sell the Products. However, despite Defendant's knowledge of the Challenged Representation's falsity, and Defendant's knowledge that consumers reasonably rely on the Challenged Representation in deciding to buy the Products, Defendant deliberately chose to market the Products with the Challenged Representation thereby misleading consumers into buying or overpaying for the Products. Thus, Defendant knew, or should have known, at all relevant times, that the Challenged Representation misleads reasonable consumers, such as Plaintiffs, into buying the Products to attain the product-attributes that Defendant falsely advertised and warranted.

45.     **Detriment.**  Plaintiffs and similarly situated consumers would not have purchased the Products, or would not have overpaid a price premium for the Products, if they had known that the Challenged Representation was false and, therefore, the Products do not have the attribute claimed, promised, warranted, advertised, and/or represented. Accordingly, based on Defendant's material misrepresentations and omissions, reasonable consumers, including Plaintiffs, purchased the Products to their detriment.

## F.     The Products' Substantial Similarity

46.     As described herein, Plaintiffs purchased the Sneed Purchased Product and the Cannon Purchased Product. The additional Products (collectively, the "**Unpurchased Products**") are substantially similar to the Purchased Product.

a. **Defendant.** All Products are manufactured, sold, marketed, advertised, labeled, and packaged by Defendant.

b. **Brand.**  All Products are sold under the same brand name: ZzzQuil™.

c. **Key Active Ingredient.** All Products contain the same active ingredient, Diphenhydramine.

SECOND AMENDED CLASS ACTION COMPLAINT

d. **Marketing Demographics.** All Products are marketed directly to consumers for personal use.

e. **Challenged Misrepresentation.** All Products contain the same Challenged Representation, "Non-Habit Forming," conspicuously and prominently placed on the primary display panel of the front label and/or packaging. *See* **Exhibit 1** [Product labels]. Defendant buttresses the Challenged Representation through a pervasive and consistent brand strategy effectuated through its marketing campaign to identify the Products as being "Non-Habit Forming." *See* **Exhibit 2** [Digital Marketing].

f. **Packaging.** All Products are packaged in similar packaging, with the phrase "Non-Habit Forming" appearing on the front label in prominent, bold type font.

g. **Misleading Effect.** The misleading effect of the Challenged Representation on consumers is the same for all Products—consumers pay for non-habit forming products, but receive Products that can cause habitual use.

**G.    No Adequate Remedy at Law**

47.    **No Adequate Remedy at Law.** Plaintiffs and members of the Class are entitled to equitable relief as no adequate remedy at law exists.

a. **Broader Statutes of Limitations.** The statutes of limitations for the causes of action pled herein vary. The limitations period is four years for claims brought under the UCL, which is one year longer than the statutes of limitations under the FAL and CLRA. In addition, the statutes of limitations vary for certain states' laws for breach of warranty and unjust enrichment/restitution, between approximately 2 and 6 years. Thus, California Subclass members who purchased the Products more than 3 years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL. Similarly, Nationwide Class members who purchased the Products prior to the furthest reach-back under the statute of limitations for breach of warranty, will be barred from recovery if equitable relief were not permitted for restitution/unjust enrichment.

b. **Broader Scope of Conduct.** In addition, the scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes, for example, Defendant's overall unfair marketing scheme to promote and brand the Products with the Challenged Representation, across a multitude of media platforms, including the Products' labels and packaging, over a long period of time, in order to gain an unfair advantage over competitor products and to take advantage of consumers' desire for products that comport with the Challenged Representation. The UCL also creates a cause of action for violations of law (such as statutory or regulatory requirements and court orders related to similar representations and omissions made on the type of products at issue). Thus, Plaintiffs and Class members may be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the FAL requires actual or constructive knowledge of the falsity; the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct). Similarly, unjust enrichment/restitution is broader than breach of warranty. For example, in some states, breach of warranty may require privity of contract or pre-lawsuit

24

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

notice, which are not typically required to establish unjust enrichment/restitution. Thus, Plaintiffs and Class members may be entitled to recover under unjust enrichment/restitution, while not entitled to damages under breach of warranty, because they purchased the products from third-party retailers or did not provide adequate notice of a breach prior to the commencement of this action.

c. **Injunctive Relief to Cease Misconduct and Dispel Misperception.** Injunctive relief is appropriate on behalf of Plaintiffs and members of the Class because Defendant continues to misrepresent the Products with the Challenged Representation. Injunctive relief is necessary to prevent Defendant from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Further, injunctive relief, in the form of affirmative disclosures is necessary to dispel the public misperception about the Products that has resulted from years of Defendant's unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements that the Products' Challenged Representation is not true and providing accurate information about the Products' true nature; and/or requiring prominent qualifications and/or disclaimers on the Products' front label concerning the Products' true nature. An injunction requiring affirmative disclosures to dispel the public's misperception and prevent the ongoing deception and repeat purchases based thereon, is also not available through a legal remedy (such as monetary damages). In addition, Plaintiffs are *currently* unable to accurately quantify the damages caused by Defendant's future harm, because discovery and Plaintiffs' investigation has not yet completed, rendering injunctive relief all the more necessary. For example, because the court has not yet certified any class, the following remains unknown: the scope of the class, the identities of its members, their respective purchasing practices, prices of past/future Product sales, and quantities of past/future Product sales.

d. **Public Injunction.** Further, because a "public injunction" is available under the UCL, damages will not adequately "benefit the general public" in a manner equivalent to an injunction.

e. **California vs. Nationwide Class Claims**. Violations of the UCL, FAL, and CLRA are claims asserted on behalf of Plaintiffs and the California Subclass against Defendant, while breach of warranty and unjust enrichment/restitution are asserted on behalf of Plaintiffs and the Nationwide Class. Dismissal of farther-reaching claims, such as restitution, would bar recovery for non-California members of the Class. In other words, legal remedies available or adequate under the California-specific causes of action (such as the UCL, FAL, and CLRA) have no impact on this Court's jurisdiction to award equitable relief under the remaining causes of action asserted on behalf of non-California putative class members.

f. **Procedural Posture—Incomplete Discovery & Pre-Certification.** Lastly, this is an initial pleading in this action, and discovery has not yet commenced and/or is at its initial stages. No class has been certified yet. No expert discovery has commenced and/or completed. The completion of fact/non-expert and expert discovery, as well as the certification of this case as a class action, are necessary to finalize and determine the adequacy and availability of all remedies, including legal and equitable, for Plaintiffs' individual claims and any certified class or subclass. Plaintiffs therefore reserve their right to amend this complaint and/or assert additional facts that demonstrate this Court's jurisdiction to order equitable remedies where no adequate legal remedies are available for either Plaintiffs

and/or any certified class or subclass. Such proof, to the extent necessary, will be presented prior to the trial of any equitable claims for relief and/or the entry of an order granting equitable relief.

## VI.    CLASS ACTION ALLEGATIONS

48.    **Class Definition**. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of themselves and all others similarly situated, and as members of the Classes defined as follows:

> All residents of the United States who, within the applicable statute of limitations periods, purchased the Products containing the Challenged Representation on the Products' labels or packaging, for purposes other than resale ("**Nationwide Class**");

> All residents of California who, within four years prior to the filing of this Complaint, purchased the Products, containing the Challenged Representation on the Products' labels or packaging, for purposes other than resale ("**California Subclass**"); and

("Nationwide Class" and "California Subclass" collectively, the "**Class**").

49.    **Class Definition Exclusions.** Excluded from the Class are: (i) Defendant, its assigns, successors, and legal representatives; (ii) any entities in which Defendant has controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

50.    **Reservation of Rights to Amend the Class Definition**. Plaintiffs reserve the right to amend or otherwise alter the class definition presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

51.    **Numerosity:** Members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Nationwide Class consists of tens of thousands of purchasers (if not more) dispersed throughout the United States, and the California Subclass likewise consists of thousands of purchasers (if not more) dispersed throughout the state of California. Accordingly, it would be impracticable to join all members of the Class before the Court.

//

//

SECOND AMENDED CLASS ACTION COMPLAINT

52.    **Common Questions Predominate:** There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any individual issues. Included within the common questions of law or fact are:

a.    Whether Defendant engaged in unlawful, unfair or deceptive business practices by advertising and selling the Products;

b.    Whether Defendant's conduct of advertising and selling the Products as "Non-Habit Forming" when they contain habit-forming ingredients constitutes an unfair method of competition, or unfair or deceptive act or practice, in violation of Civil Code section 1750, et seq.;

c.    Whether Defendant used the deceptive representation in connection with the sale of the Products in violation of Civil Code section 1750, et seq.;

d.    Whether Defendant represented that the Products have characteristics or quantities that they do not have in violation of Civil Code section 1750, et seq.;

e.    Whether Defendant advertised the Products with intent not to sell them as advertised in violation of Civil Code section 1750, et seq.;

f.    Whether Defendant's labeling and advertising of the Products are untrue or misleading in violation of Business and Professions Code section 17500, et seq.;

g.    Whether Defendant knew or by the exercise of reasonable care should have known its labeling and advertising was and is untrue or misleading in violation of Business and Professions Code section 17500, et seq.;

h.    Whether Defendant's conduct is an unfair business practice within the meaning of Business and Professions Code section 17200, et seq.;

i.    Whether Defendant's conduct is a fraudulent business practice within the meaning of Business and Professions Code section 17200, et seq.;

j.    Whether Defendant's conduct is an unlawful business practice within the meaning of Business and Professions Code section 17200, et seq.;

k.    Whether Plaintiffs and the Class paid more money for the Products than they actually received;

l.    How much more money Plaintiffs and the Class paid for the Products than they actually received;

m.    Whether Defendant's conduct constitutes breach of warranty;

n.    Whether Plaintiffs and the Class are entitled to injunctive relief; and

o.    Whether Defendant was unjustly enriched by their unlawful conduct.

53.    **Typicality:** Plaintiffs' claims are typical of the claims of the Class Members they seek to represent because Plaintiffs, like the Class Members purchased Defendant's misleading and

deceptive Products.   Defendant's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiffs and the Class sustained similar injuries arising out of Defendant's conduct.  Plaintiffs' and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

54.   **Adequacy:** Plaintiffs are adequate representatives of the Class they seek to represent because their interests do not conflict with the interests of the Class Members Plaintiffs seek to represent. Plaintiffs will fairly and adequately protect Class Members' interests and have retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

55.   **Superiority and Substantial Benefit:** A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

    a.   The claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Class;

    b.   Absent a Class, the members of the Class will continue to suffer damage and Defendant's unlawful conduct will continue without remedy while Defendant profits from and enjoy its ill-gotten gains;

    c.   Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

    d.   When the liability of Defendant has been adjudicated, claims of all members of the Class can be administered efficiently and/or determined uniformly by the Court; and

    e.   This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiffs and Class Members can seek redress for the harm caused to them by Defendant.

56.   **Inconsistent Rulings.** Because Plaintiffs seek relief for all members of the Class, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

28

SECOND AMENDED CLASS ACTION COMPLAINT

57.    **Injunctive/Equitable Relief**. The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

58.    **Manageability**. Plaintiffs and Plaintiffs' counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## VII.    CAUSES OF ACTION

### COUNT ONE

**Violation of California Unfair Competition Law**

**(Cal. Bus. & Prof. Code §§ 17200, *et seq*.)**

***(On Behalf of Plaintiffs Sneed and Cannon and the California Subclass)***

59.    **Incorporation by Reference**. Plaintiffs Sneed and Cannon re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

60.    **California Subclass**. This cause of action is brought pursuant to Business and Professions Code Section 17200, et seq., on behalf of Plaintiffs and a California Subclass who purchased the Products within the applicable statute of limitations.

61.    **The UCL**. California Business & Professions Code, sections 17200, et seq. (the "**UCL**") prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

62.    **False Advertising Claims**. Defendant, in its advertising and packaging of the Products, made false and misleading statements and fraudulent omissions regarding the quality and characteristics of the Products—specifically, the "Non-Habit Forming" representation—despite the fact the Products promote habitual use as part of consumers' nightly routine because of the inclusion of Diphenhydramine in the Products. Such claims and omissions appear on the label and packaging of the Products, which are sold at retail stores and point-of-purchase displays.

//

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

63. **Defendant's Deliberately False and Fraudulent Marketing Scheme**. Defendant does not have any reasonable basis for the claims about the Products made in Defendant's advertising and on Defendant's packaging or labeling because the Products can result in habitual use, contrary to the Challenged Representation. Defendant knew and knows that the Products do not conform to the Challenged Representation, though Defendant intentionally advertised and marketed the Products to deceive reasonable consumers into believing that they are "Non-Habit Forming."

64. **False Advertising Claims Cause Purchase of Products**. Defendant's labeling and advertising of the Products led to and leads to reasonable consumers, including Plaintiffs Sneed and Cannon, believing that the Products do not and cannot cause habitual use.

65. **Injury in Fact.** Plaintiffs Sneed and Cannon and the California Subclass have suffered injury in fact and have lost money as a result of and in reliance upon Defendant's Challenged Representation—namely Plaintiffs Sneed and Cannon and the California Subclass lost the purchase price for the Products they bought from the Defendant.

66. **Conduct Violates the UCL**. Defendant's conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus & Prof. Code § 17200. In addition, Defendant's use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code Sections 17200 and 17531, which advertisements have deceived and are likely to deceive the consuming public, in violation of Business and Professions Code Section 17200.

67. **No Reasonably Available Alternatives/Legitimate Business Interests.** Defendant failed to avail itself of reasonably available, lawful alternatives to further its legitimate business interests.

//

SECOND AMENDED CLASS ACTION COMPLAINT

68.    **Business Practice**. All of the conduct alleged herein occurred and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern, practice and/or generalized course of conduct, which will continue on a daily basis until Defendant voluntarily alters its conduct or Defendant is otherwise ordered to do so.

69.    **Injunction**. Pursuant to Business and Professions Code Sections 17203 and 17535, Plaintiffs Sneed and Cannon and the members of the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of labeling and advertising the sale and use of the Products. Likewise, Plaintiffs Sneed and Cannon and the members of the California Subclass seek an order requiring Defendant to disclose such misrepresentation, and to preclude Defendant's failure to disclose the existence and significance of said misrepresentation.

70.    **Causation/Damages**. As a direct and proximate result of Defendant's misconduct in violation of the UCL, Plaintiffs Sneed and Cannon and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiffs Sneed and Cannon and members of the California Subclass have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of the UCL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs Sneed and Cannon and the California Subclass for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

71.    **Punitive Damages**. Plaintiffs Sneed and Cannon seek punitive damages pursuant to this cause of action for violation of the UCL on behalf of Plaintiffs Sneed and Cannon and the California Subclass. Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiffs Sneed and Cannon and consumers to pay for Products that they were not, in fact, receiving.  Defendant willfully and knowingly disregarded the rights of Plaintiffs Sneed and

31

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

Cannon and consumers as Defendant was, at all times, aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiffs Sneed and Cannon. Defendant's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct. Said misconduct subjected Plaintiffs Sneed and Cannon and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendant's misconduct is fraudulent as Defendant intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiffs Sneed and Cannon and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant.

### A. "Unfair" Prong

72.    **Unfair Standard.** Under the UCL, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).

73.    **Injury**. Defendant's action of mislabeling the Products with the Challenged Representation does not confer any benefit to consumers; rather, doing so causes injuries to consumers, who do not receive products commensurate with their reasonable expectations, overpay for the Products, and receive Products of lesser standards than what they reasonably expected to receive. Consumers cannot avoid any of the injuries caused by Defendant's deceptive labeling and advertising of the Products. Accordingly, the injuries caused by Defendant's deceptive labeling and advertising outweigh any benefits.

74.    **Balancing Test.** Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. They "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).

75.    **No Utility.** Here, Defendant's conduct of labeling the Products with the Challenged Representation when, in reality, the Products promote habitual use in consumers' nightly routine

32

has no utility and financially harms purchasers. Thus, the utility of Defendant's conduct is vastly outweighed by the gravity of harm.

76.    **Legislative Declared Policy.** Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 735 (9th Cir. 2007).

77.    **Unfair Conduct.** Defendant's labeling and advertising of the Products, as alleged herein, is false, deceptive, misleading, and unreasonable, and constitutes unfair conduct. Defendant knew or should have known of its unfair conduct. Defendant's misrepresentation constitutes an unfair business practice within the meaning of California Business and Professions Code Section 17200.

78.    **Reasonably Available Alternatives.** There existed reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. Defendant could have refrained from labeling the Products with the Non-Habit Forming Representation.

79.    **Defendant's Wrongful Conduct.** All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

80.    **Injunction**. Pursuant to Business and Professions Code Sections 17203, Plaintiffs Sneed and Cannon and the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practices of labeling the Products with the Challenged Representation.

81.    **Causation/Damages.** Plaintiffs Sneed and Cannon and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair conduct. Plaintiffs Sneed and Cannon and the California Subclass paid an unwarranted premium for these Products. Specifically, Plaintiffs Sneed and Cannon and the California Subclass paid for Products that were truly "non-habit forming." Plaintiffs Sneed and Cannon and the California Subclass would not have purchased the Products, or would have paid substantially less for the Products, if they had known

SECOND AMENDED CLASS ACTION COMPLAINT

that the Products' advertising and labeling were deceptive. Accordingly, Plaintiffs Sneed and Cannon seek damages, restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

### B. "Fraudulent" Prong

82.   **Fraud Standard.** The UCL considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public. *Bank of the West v. Super. Court*, 2 Cal. 4th 1254, 1267 (1992).

83.   **Fraudulent & Material Challenged Representation**. Defendant used the Challenged Representation with the intent to sell the Products to consumers, including Plaintiffs Sneed and Cannon and the California Subclass. The Challenged Representation is false and Defendant knew or should have known of its falsity. The Challenged Representation is likely to deceive consumers into purchasing the Products because they are material to the average, ordinary, and reasonable consumer.

84.   **Fraudulent Business Practice**. As alleged herein, the misrepresentation by Defendant constitutes a fraudulent business practice in violation of California Business & Professions Code Section 17200.

85.   **Reasonable and Detrimental Reliance.** Plaintiffs Sneed and Cannon and the California Subclass reasonably and detrimentally relied on the material and false Challenged Representation to their detriment in that they purchased the Products.

86.   **Reasonably Available Alternatives.** Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from labeling the Products with the Challenged Representation.

87.   **Business Practice.** All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct.

88.   **Injunction**. Pursuant to Business and Professions Code Sections 17203, Plaintiffs Sneed and Cannon and the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of labeling the Products with the Challenged Representation.

34

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

89.    **Causation/Damages**. Plaintiffs Sneed and Cannon and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's fraudulent and unfair conduct. Plaintiffs Sneed and Cannon paid an unwarranted premium for the Products. Specifically, Plaintiffs Sneed and Cannon and the California Subclass paid for products that they believed do not and cannot cause habitual use, when, in fact, the Products promote and can result in habit formation. Plaintiffs Sneed and Cannon and the California Subclass would not have purchased the Products, or would have paid substantially less for the Products, if they had known the truth about Defendant's misleading and deceptive advertising and labeling scheme. Accordingly, Plaintiffs Sneed and Cannon seek damages, restitution, and/or disgorgement of ill-gotten gains pursuant to the UCL.

### C. "Unlawful" Prong

90.    **Unlawful Standard.** The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

91.    **Violations of CLRA and FAL.** Defendant's labeling of the Products, as alleged herein, violates California Civil Code sections 1750, et seq. (the "**CLRA**") and California Business and Professions Code sections 17500, et seq. (the "**FAL**") as set forth below in the sections regarding those causes of action.

92.    **Additional Violations.** Defendant's conduct in making the false representation described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors. This conduct engenders an unfair competitive advantage for Defendant, thereby constituting an unfair, fraudulent and/or unlawful business practice under California Business & Professions Code sections 17200-17208. Additionally, Defendant's misrepresentation of material facts, as set forth herein, violate California Civil Code sections 1572, 1573, 1709, 1710, 1711, and 1770, as well as the common law.

93.    **Unlawful Conduct.** Defendant's packaging, labeling, and advertising of the Products, as alleged herein, are false, deceptive, misleading, and unreasonable, and constitute unlawful conduct. Defendant knew or should have known of its unlawful conduct.

SECOND AMENDED CLASS ACTION COMPLAINT

94.    **Reasonably Available Alternatives.** Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from labeling the Products with the Challenged Representation.

95.    **Business Practice.** All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct.

96.    **Injunction**. Pursuant to Business and Professions Code Section 17203, Plaintiffs Sneed and Cannon and the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of false and deceptive advertising of the Products.

97.    **Causation/Damages**. Plaintiffs Sneed and Cannon and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's unlawful conduct. Plaintiffs Sneed and Cannon and the California Subclass paid an unwarranted premium for the Products. Specifically, Plaintiffs Sneed and Cannon and the California Subclass paid for Products that were supposedly "non-habit-forming" despite the fact that diphenhydramine, an ingredient used in the Products, leads to habitual use by unwitting consumers. Plaintiffs Sneed and Cannon and the subclass would not have purchased the Products if they had known that Defendant's purposely deceived consumers into believing that the Products truly conform to the Challenged Representation. Accordingly, Plaintiffs Sneed and Cannon seek damages, restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

## COUNT TWO

**Violation of California False Advertising Law**

**(Cal. Bus. & Prof. Code §§ 17500, *et seq.*)**

*(On Behalf of Plaintiffs Sneed and Cannon and the California Subclass)*

98.    **Incorporation by reference.** Plaintiffs Sneed and Cannon re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

99.    **California Subclass.** Plaintiffs Sneed and Cannon bring this claim individually and on behalf of the California Subclass who purchased the Products within the applicable statute of limitations.

100. **FAL Standard**. The False Advertising Law, codified at Cal. Bus. & Prof. Code section 17500, et seq., prohibits "unfair, deceptive, untrue or misleading advertising[.]"

101. **False & Material Challenged Representation Disseminated to Public.** Defendant violated section 17500 when it advertised and marketed the Products through the unfair, deceptive, untrue, and misleading Challenged Representation disseminated to the public through the Products' labeling, packaging, and advertising. This representation was false because the Products do not conform it. The representation was material because it is likely to mislead a reasonable consumer into purchasing the Products.

102. **Knowledge**. In making and disseminating the representation alleged herein, Defendant knew or should have known that the representation was untrue or misleading, and acted in violation of § 17500.

103. **Intent to sell.** Defendant's Challenged Representation was specifically designed to induce reasonable consumers, like Plaintiffs Sneed and Cannon and the California Subclass, to purchase the Products.

104. **Causation/Damages**. As a direct and proximate result of Defendant's misconduct in violation of the FAL, Plaintiffs Sneed and Cannon and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiffs Sneed and Cannon and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs Sneed and Cannon seek a monetary award for violation of the FAL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs Sneed and Cannon and the California Subclass for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

105. **Punitive Damages**. Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiffs Sneed and Cannon and consumers to pay for Products that they were not,

37

SECOND AMENDED CLASS ACTION COMPLAINT

in fact, receiving.  Defendant willfully and knowingly disregarded the rights of Plaintiffs Sneed and Cannon and consumers as Defendant was aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiffs Sneed and Cannon.  Defendant's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct.  Said misconduct subjected Plaintiffs Sneed and Cannon and consumers to cruel and unjust hardship in knowing disregard of their rights.   Defendant's misconduct is fraudulent as Defendant, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiffs Sneed and Cannon and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant.

## COUNT THREE

### Violation of California Consumers Legal Remedies Act

### (Cal. Civ. Code §§ 1750, *et seq.*)

### *(On Behalf of Plaintiffs Sneed and Cannon and the California Subclass)*

106.    **Incorporation by Reference**. Plaintiffs Sneed and Cannon re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

107.    **California Subclass**. Plaintiffs Sneed and Cannon bring this claim individually and on behalf of the California Subclass who purchased the Products within the applicable statute of limitations.

108.    **CLRA Standard**. The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

109.    **Goods/Services.** The Products are "goods," as defined by the CLRA in California Civil Code §1761(a).

110.    **Defendant**. Defendant is a "person," as defined by the CLRA in California Civil Code §1761(c).

//

38

SECOND AMENDED CLASS ACTION COMPLAINT

111.    **Consumers**. Plaintiffs Sneed and Cannon and members of the California Subclass are "consumers," as defined by the CLRA in California Civil Code §1761(d).

112.    **Transactions**. The purchase of the Products by Plaintiffs Sneed and Cannon and members of the California Subclass are "transactions" as defined by the CLRA under California Civil Code section 1761(e).

113.    **Violations of the CLRA.** Defendant violated the following sections of the CLRA by selling the Products to Plaintiffs Sneed and Cannon and the California Subclass through the false, misleading, deceptive, and fraudulent Challenged Representation:

    a.    Section 1770(a)(5) by representing that the Products have "characteristics, . . . uses [or] benefits . . . which [they] do not have."

    b.    Section 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade . . . [when] they are of another."

    c.    Section 1770(a)(9) by advertising the Products "with [the] intent not to sell them as advertised."

114.    **Knowledge**. Defendant's uniform and material representations and omissions regarding the Products were likely to deceive, and Defendant knew or should have known that its representations and omissions were untrue and misleading.

115.    **Malicious**. Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally misled and withheld material information from consumers, including Plaintiffs, to increase the sale of the Products.

116.    **Plaintiffs Could Not Have Avoided Injury.** Plaintiffs and members of the California Subclass could not have reasonably avoided such injury.  Plaintiffs and members of the California Subclass were unaware of the existence of the facts that Defendant suppressed and failed to disclose, and Plaintiffs and members of the California Subclass would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

117.    **Causation/Reliance/Materiality**. Plaintiffs Sneed and Cannon and the California Subclass suffered harm as a result of Defendant's violations of the CLRA because they relied on the Challenged Representation in deciding to purchase the Products.    The Challenged

39

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Representation was a substantial factor. The Challenged Representation was material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

118.    **Section 1782(d)—Prelitigation Demand/Notice.** Pursuant to California Civil Code, section 1782, more than thirty (30) days prior to filing this complaint, on or about November 2, 2021, Plaintiffs' counsel, acting on behalf of all members of the Class, mailed a Demand Letter, via U.S. certified mail, return receipt requested, addressed to Defendant Proctor & Gamble, Inc. at its headquarters and principal place of business (One Procter & Gamble Plaza, C9-160, Cincinnati, Ohio, 45202) and its registered agent for service of process (CT Corp. System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio, 43219), which were delivered to those addresses on November 9, 2021 and November 6, 2021, respectively. The letter advised Defendant of its violations of the California Consumers Legal Remedies Act, as set forth above and demanded that Defendant correct and otherwise rectify those violations with respect to the Class. *See* **Exhibit 3** [November 2, 2021 Pre-Suit Demand Letter]. Concurrent with the filing of this action, and more than thirty (30) days prior to the filing of this Second Amended Class Action Complaint, Plaintiffs' counsel, acting on behalf of Plaintiff and members of the class, on October 23, 2023, mailed a Follow-Up Demand Letter, via U.S. certified mailed return receipt requested and addressed to Defendant at its principal place of business registered with the California Secretary of State (One Procter & Gamble Plaza, C9-160, Cincinnati, Ohio, 45202) and its registered agent for service process (CT Corp. System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio, 43219), which were delivered to both addresses on October 26, 2023. The letter advised Defendant of its violations of the California Consumers Legal Remedies Act, as set forth above; enclosed a copy of the Class Action Complaint (ECF 1) and Exhibit 1-3 (ECF 1-1 – 1-3) filed in this action; and demanded that Defendant correct and otherwise rectify those violations with respect to Plaintiffs and all members of the Class. *See* **Exhibit 4** [October 23, 2023 Pre-Suit Demand Letter]. The notices of Defendant's violations and demand for remedial action, as of the filing of this complaint, did not result in adequate correction, repair, replacement, and/or other remedy by Defendant, including all remedial action set forth in the letter and as set forth under section 1782(c).

//

SECOND AMENDED CLASS ACTION COMPLAINT

119. **Causation/Damages**. As a direct and proximate result of Defendant's misconduct in violation of the CLRA, Plaintiffs Sneed and Cannon and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiffs Sneed and Cannon and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs Sneed and Cannon seek a monetary award for violation of this Act in the form of damages, restitution, disgorgement of ill-gotten gains to compensate Plaintiffs Sneed and Cannon and the California Subclass for said monies.

120. **Injunction**. Given that Defendant's conduct violated California Civil Code section 1780, Plaintiffs Sneed and Cannon and members of the California Subclass are entitled to seek, and do hereby seek, injunctive relief to put an end to Defendant's violations of the CLRA. Plaintiffs Sneed and Cannon have no adequate remedy at law. Without equitable relief, Defendant's unfair and deceptive practices will continue to harm Plaintiffs Sneed and Cannon and the California Subclass.

121. **Punitive Damages**.  Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiffs Sneed and Cannon and consumers to pay for Products that they were not, in fact, receiving. Defendant willfully and knowingly disregarded the rights of Plaintiffs Sneed and Cannon and consumers as Defendant was, at all times, aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiffs Sneed and Cannon. Defendant's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct. Said misconduct subjected Plaintiffs and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendant's misconduct is fraudulent as Defendant, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiffs Sneed and Cannon and consumers. The

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

SECOND AMENDED CLASS ACTION COMPLAINT

wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant. Accordingly, Plaintiffs Sneed and Cannon seek an award of punitive damages against Defendant.

**COUNT FOUR**

**Breach of Warranty**

**Violation of Cal. Comm. Code § 2313**

*(On Behalf of Plaintiffs Sneed and Cannon and the California Subclass)*

122.    **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

123.    **California Subclass**. Plaintiffs Sneed and Cannon bring this claim individually and on behalf of the California Subclass who purchased the Products within the applicable statute of limitations.

124.    **Express Warranty**. By advertising and selling the Products at issue, Defendant made promises and affirmations of fact on the Products' packaging and labeling, and through its marketing and advertising, as described herein. This labeling and advertising constitute express warranties and became part of the basis of the bargain between Plaintiffs Sneed and Cannon and members of the California Subclass and Defendant. Defendant purports, through the Products' labeling and advertising, to create express warranties that the Products, among other things, conform to the Challenged Representation.

125.    **Implied Warranty of Merchantability.** By advertising and selling the Products at issue, Defendant, a merchant of goods, made promises and affirmations of fact that the Products are merchantable and conform to the promises or affirmations of fact made on the Products' packaging and labeling, and through its marketing and advertising, as described herein. This labeling and advertising, combined with the implied warranty of merchantability, constitute warranties that became part of the basis of the bargain between Plaintiffs Sneed and Cannon, members of the California Subclass, and Defendant---to wit, that the Products, among other things, conform to the Challenged Representation.

//

42

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

126. **Breach of Warranty.** Contrary to Defendant's warranties, the Products do not conform to the Challenged Representation and, therefore, Defendant breached its warranties about the Products and their qualities.

127. **Causation/Remedies**. As a direct and proximate result of Defendant's breach of warranty, Plaintiffs Sneed and Cannon and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiffs Sneed and Cannon and members of the California Subclass have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs Sneed and Cannon seek a monetary award for breach of warranty in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs Sneed and Cannon and the California Subclass for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

128. **Notice of Breach and Failure to Rectify**. Plaintiffs have sent Defendant multiple notices regarding its breach of warranty, as described herein:

    a.  More than thirty (30) days prior to the filing of this action, on or about November 2, 2021, Plaintiffs' counsel, acting on behalf of all members of the Class, including the Nationwide Class, mailed a Demand Letter, via U.S. certified mail, return receipt requested, addressed to Defendant Proctor & Gamble, Inc. at its headquarters and principal place of business registered with the California Secretary of State (One Procter & Gamble Plaza, C9-160, Cincinnati, Ohio, 45202) and its registered agent for service of process (CT Corp. System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio, 43219), which were delivered to those addresses on November 9, 2021 and November 6, 2021, respectively. *See* **Exhibit 3** [November 2, 2021 Pre-Suit Demand Letter]. The letter advised Defendant that, contrary to its express labeling claim that the Products are "Non-Habit Forming," the Products' active ingredient diphenhydramine causes habitual use—i.e., Defendant has breached this warranty, as

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

set forth above—and demanded that Defendant correct and otherwise rectify this breach with respect to the Class. *See id.*

b.  More than thirty (30) days prior to the filing of this amended complaint, on or about October 23, 2023, Plaintiffs' counsel, acting on behalf of all members of the Class, including the Nationwide Class, mailed a Demand Letter, via U.S. certified mail, return receipt requested, addressed to Defendant Proctor & Gamble, Inc. at its headquarters and principal place of business registered with the California Secretary of State (One Procter & Gamble Plaza, C9-160, Cincinnati, Ohio, 45202) and its registered agent for service process (CT Corp. System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio, 43219), which were delivered to both addresses on October 26, 2023. *See* **Exhibit 4** [October 23, 2023 Pre-Suit Demand Letter]. The letter advised Defendant that, contrary to its express labeling claim that the Products are "Non-Habit Forming," the Products' active ingredient diphenhydramine causes habitual use—i.e., Defendant has breached this warranty, as set forth above—and demanded that Defendant correct and otherwise rectify this breach with respect to the Class. *See id.* The letter also enclosed a copy of the Class Action Complaint (ECF 1) and Exhibit 1-3 (ECF 1-1 – 1-3) filed in this action. *See id.*

129.  The notices of Defendant's breach of warranty (i.e., untruthful "Non-Habit Forming" labeling claim) and demand for remedial action, as of the filing of this complaint, did not result in adequate correction, repair, replacement, and/or other remedy by Defendant, including all remedial action requested in said notices.

130.  **Punitive Damages**.  Plaintiffs Sneed and Cannon seek punitive damages pursuant to this cause of action for breach of warranty on behalf of Plaintiffs Sneed and Cannon and the California Subclass. Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiffs and consumers to pay for Products that they were not, in fact, receiving. Defendant willfully and knowingly disregarded the rights of Plaintiffs and consumers as Defendant

SECOND AMENDED CLASS ACTION COMPLAINT

was aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiffs. Defendant's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such misconduct. Said misconduct subjected Plaintiffs and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendant's misconduct is fraudulent as Defendant, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiffs and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant.

## COUNT FIVE

### Unjust Enrichment/Restitution

#### *(On Behalf of Plaintiffs Sneed and Cannon and the California Subclass)*

131. **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

132. **California Subclass.** Plaintiffs Sneed and Cannon bring this claim individually and on behalf of the California Subclass who purchased the Products within the applicable statute of limitations.

133. **Plaintiffs/Class Conferred a Benefit.** By purchasing the Products, Plaintiffs Sneed and Cannon and members of the California Subclass conferred a benefit on Defendant in the form of the purchase price of the Products.

134. **Defendant's Knowledge of Conferred Benefit.** Defendant had knowledge of such benefit and Defendant appreciated the benefit because, were consumers not to purchase the Products, Defendant would not generate revenue from the sales of the Products.

135. **Defendant's Unjust Receipt Through Deception.** Defendant's knowing acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendant's fraudulent, misleading, and deceptive representations and omissions.

136. **Causation/Damages**. As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs Sneed and Cannon and members of the California Subclass were harmed in

45

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

the amount of the purchase price they paid for the Products. Further, Plaintiffs Sneed and Cannon and members of the California Subclass have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs Sneed and Cannon seek a monetary award for unjust enrichment in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs Sneed and Cannon and the California Subclass for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

137. **Punitive Damages.** Plaintiffs Sneed and Cannon seek punitive damages pursuant to this cause of action for unjust enrichment on behalf of Plaintiffs Sneed and Cannon and the California Subclass. Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiffs and consumers to pay for Products that they were not, in fact, receiving. Defendant willfully and knowingly disregarded the rights of Plaintiffs and consumers as Defendant was aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiffs. Defendant's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct. Said misconduct subjected Plaintiffs and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendant's misconduct is fraudulent as Defendant, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiffs and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant.

## VIII. PRAYER FOR RELIEF

138. WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, prays for judgment against Defendant as follows:

SECOND AMENDED CLASS ACTION COMPLAINT

a. **Certification:** For an order certifying this action as a class action, appointing Plaintiffs as the Class Representatives, and appointing Plaintiffs' Counsel as Class Counsel;

b. **Declaratory Relief:** For an order declaring that Defendant's conduct violates the statutes and laws referenced herein;

c. **Injunction:** For an order requiring Defendant to immediately cease and desist from selling the unlawful Products in violation of law; enjoining Defendant from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described herein; requiring Defendant to engage in an affirmative advertising campaign to dispel the public misperception of the Products resulting from Defendant's unlawful conduct; and requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted;

d. **Damages/Restitution/Disgorgement:** For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiffs and the Class, consistent with permissible law and pursuant to only those causes of action so permitted;

e. **Punitive Damages/Penalties:** For an order awarding punitive damages, statutory penalties, and/or monetary fines, consistent with permissible law and pursuant to only those causes of action so permitted;

f. **Attorneys' Fees & Costs:** For an order awarding attorneys' fees and costs, consistent with permissible law and pursuant to only those causes of action so permitted;

g. **Pre/Post-Judgment Interest:** For an order awarding pre-judgment and post-judgment interest, consistent with permissible law and pursuant to only those causes of action so permitted; and

h. **All Just & Proper Relief:** For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues and causes of action so triable.

Dated: September 16, 2024                    **CLARKSON LAW FIRM, P.C.**

                                             _/s/ Bahar Sodaify_
                                             Ryan J. Clarkson
                                             Bahar Sodaify
                                             Alan Gudino

                                             *Attorneys for Plaintiffs*

SECOND AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265