Mariam Azhar (SBN 329715)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: (415) 591-6000
Email: mazhar@cov.com

Andrew Soukup (*pro hac vice*)
Sameer Aggarwal (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000
Email: asoukup@cov.com
        saggarwal@cov.com

*Attorneys for Defendant*
*The Procter & Gamble Company*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| STEPHEN SNEED, and NICKOLAS CANNON, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>THE PROCTER & GAMBLE COMPANY,<br><br>    Defendant. | Civil Case No. 4:23-cv-05443-JST<br><br>**DEFENDANT THE PROCTER & GAMBLE COMPANY'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Date: January 9, 2025<br>Time: 2:00 p.m.<br>Location: Videoconference<br>Judge: Hon. Jon S. Tigar |

DEFENDANT'S NOTICE OF MOTION AND
MOTION TO DISMISS SECOND AMENDED
COMPLAINT

Civil Case No. 4:23-cv-05443-JST

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on January 9, 2025, at 2:00 p.m., or as soon thereafter as counsel may be heard before the Honorable Jon S. Tigar, Defendant The Procter & Gamble Company ("P&G") will and hereby does move pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order dismissing Plaintiffs' Second Amended Complaint (ECF No. 47).

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, P&G's Request for Judicial Notice and accompanying exhibits, the documents on file with the Court, and such further evidence and argument as the Court may permit.

For preservation purposes only, P&G incorporates by reference in this motion all arguments it made in its motion to dismiss the First Amended Complaint, including that Plaintiffs lack Article III standing and that Plaintiffs' equitable claims are improper.  ECF No. 24.  With the exception of this Court's ruling rejecting P&G's preemption defense, which is properly raised via this motion to dismiss as opposed to a motion for reconsideration, *see In re Cal. Bail Bond Antitrust Litig.*, 2022 WL 19975276, at *8 (N.D. Cal. 2022), P&G does not ask this Court to revisit at this time any of the rulings it made in dismissing Plaintiffs' First Amended Complaint.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................................................ iii

STATEMENT OF ISSUES TO BE DECIDED ................................................................1

INTRODUCTION ............................................................................................................1

BACKGROUND ..............................................................................................................2

    A.    Plaintiffs' Allegations And The Vicks ZzzQuil Nighttime Sleep-Aid Medicine..............2

    B.    This Court Dismisses Plaintiffs' First Amended Complaint............................................3

    C.    Plaintiffs' Second Amended Complaint..........................................................................4

PROCEDURAL STANDARD ...........................................................................................5

ARGUMENT ....................................................................................................................6

I.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE THAT THE "NON-HABIT FORMING" REPRESENTATION IS FALSE. .........................................................................................6

    A.    Plaintiffs' Own Alleged Experiences Do Not Establish That ZzzQuil is Habit-Forming When Used As Directed. ............................................................................................7

    B.    Plaintiffs' New Sources Do Not Plausibly Establish That ZzzQuil is Habit-Forming When Used As Directed. ............................................................................................7

    C.    The Nemanich Declaration Does Not Plausibly Establish That ZzzQuil is Habit-Forming When Used As Directed. ...........................................................................................13

II.    PLAINTIFFS' CLAIMS ARE PREEMPTED BY FEDERAL LAW. .....................................14

III.    PLAINTIFFS' CLAIMS FAIL FOR ADDITIONAL REASONS.............................................19

    A.    The Warranty Claim Should Be Dismissed....................................................................19

    B.    The Unjust Enrichment Claim Fails For Additional Reasons. ......................................21

CONCLUSION................................................................................................................21

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aloudi v. Intramedic Res. Grp., LLC*,
     729 F. App'x 514 (9th Cir. 2017) ................................................................................... 14

*Ashcroft v. Iqbal*,
     556 U.S. 662 (2009) ................................................................................................... 5, 6

*Baker v. Nestle S.A.*,
     2019 WL 960204 (C.D. Cal. 2019) ................................................................................ 16

*Bell Atl. Corp. v. Twombly*,
     550 U.S. 544 (2007) ................................................................................................... 5, 6

*Bimont v. Unilever U.S., Inc.*,
     2015 WL 5256988 (S.D.N.Y. 2015) ............................................................................. 16

*Blanco v. Baxter Healthcare Corp.*,
     158 Cal. App. 4th 1039 (2008) ...................................................................................... 20

*Bowling v. Johnson & Johnson*,
     65 F. Supp. 3d 371 (S.D.N.Y. 2014) ............................................................................ 19

*In re Cal. Bail Bond Antitrust Litig.*,
     2022 WL 19975276 (N.D. Cal. 2022) ......................................................................... i, 15

*Canale v. Colgate-Palmolive Co.*,
     258 F. Supp. 3d 312 (S.D.N.Y. 2017) .......................................................................... 16

*Colella v. Atkins Nutritionals, Inc.*,
     348 F. Supp. 3d 120 (E.D.N.Y. 2018) .......................................................................... 16

*Critcher v. L'Oreal USA, Inc.*,
     959 F.3d 31 (2d Cir. 2020) ........................................................................................... 17

*Deras v. Volkswagen Grp. of Am., Inc.*,
     2018 WL 2267448 (N.D. Cal. 2018) ............................................................................. 21

*Ebner v. Fresh, Inc.*,
     838 F.3d 958 (9th Cir. 2016) ...................................................................................... 6, 7

*Gitson v. Trader Joe's Co.*,
     2015 WL 9121232 (N.D. Cal. 2015) ............................................................................. 18

*Goldstein v. Walmart, Inc.*,
     637 F. Supp. 3d 95 (S.D.N.Y. 2022) ......................................................................... 15, 19

*Haynes v. Hanson*,
2013 WL 1390387 (N.D. Cal. 2013) ............................................................................ 7

*Hollins v. Walmart Inc.*,
67 F.4th 1011 (9th Cir. 2023) ................................................................................... 16

*Housey v. Procter & Gamble Co.*,
2022 WL 874731 (S.D.N.Y. 2022), *aff'd*, 2022 WL 17844403 (2d Cir. 2022) .............................. 12

*Howard v. Alchemee, LLC*,
2024 WL 4272931 (C.D. Cal. Sept. 19, 2024) ................................................................... 17

*Hughes v. Ester C Co.*,
930 F. Supp. 2d 439 (E.D.N.Y. 2013) ........................................................................... 12

*Kardovich v. Pfizer, Inc.*,
97 F. Supp. 3d 131 (E.D.N.Y. 2015) ............................................................................ 12

*Martin v. Doctor's Best, Inc.*,
2023 WL 6370230 (C.D. Cal. 2023) .......................................................................... 7, 14

*Martin v. Onnit Labs, Inc.*,
2023 WL 8190712 (C.D. Cal. 2023) ............................................................................ 14

*Morgan v. Albertsons Cos.*,
2023 WL 3607275 (N.D. Cal. 2023) ............................................................................ 16

*In re MyFord Touch Consumer Litig.*,
291 F. Supp. 3d 936 (N.D. Cal. 2018) .......................................................................... 20

*Nacarino v. KSF Acquisition Corp.*,
642 F. Supp. 3d 1074 (N.D. Cal. 2022) ......................................................................... 20

*In re Natera Prenatal Testing Litig.*,
2023 WL 3370737 (N.D. Cal. 2023) ............................................................................ 20

*Novotney v. Walgreen Co.*,
2023 WL 4698149 (N.D. Ill. 2023) ............................................................................. 19

*Otto v. Abbott Labs., Inc.*,
2013 WL 12132064 (C.D. Cal. 2013) ....................................................................... 12, 14

*Roffman v. Perfect Bar, LLC*,
2022 WL 4021714 (N.D. Cal. 2022) ............................................................................ 18

*Rosewolf v. Merck & Co.*,
635 F. Supp. 3d 830 (N.D. Cal. 2022) .......................................................................... 18

*Sapienza v. Albertson's Cos.*,
2022 WL 17404919 (D. Mass. 2022) ....................................................................... 16, 17

*Seale v. GSK Consumer Health, Inc.*,
__ F. Supp. 3d __, 2024 WL 1040854 (C.D. Cal. Feb. 27, 2024) ..................................................... 15

*Stewart v. Kodiak Cakes, LLC*,
537 F. Supp. 3d 1103 (S.D. Cal. 2021) ..................................................................................... 21

*Strumlauf v. Starbucks Corp.*,
192 F. Supp. 3d 1025 (N.D. Cal. 2016)..................................................................................... 21

*Tapia Carmona v. Cnty. of San Mateo*,
2019 WL 4345973 (N.D. Cal. 2019)............................................................................................ 7

*Tubbs v. AdvoCare Int'l, L.P.*,
785 F. App'x 396 (9th Cir. 2019) ............................................................................................ 14

*Viggiano v. Hansen Nat. Corp.*,
944 F. Supp. 2d 877 (C.D. Cal. 2013)...................................................................................... 21

*Vigil v. Gen. Nutrition Corp.*,
2015 WL 8056178 (S.D. Cal. 2015) ......................................................................................... 12

*Wilson v. Frito-Lay N. Am., Inc.*,
260 F. Supp. 3d 1202 (N.D. Cal. 2017)...................................................................................... 2

**Statutes**

21 U.S.C. § 379r ...................................................................................................... 2, 14, 15, 16, 19

Cal. Civil Code § 1791.1(a)(2) ....................................................................................................... 20

Cal. Comm. Code § 2313 ............................................................................................................... 20

**Other Administrative Materials**

*Nighttime Sleep-Aid Drug Products for Over-the-Counter Human Use; Final Monograph*,
54 Fed. Reg. 6,814 (Feb. 14, 1989)................................................................................13, 17

*Over-the-Counter Drugs*,
40 Fed. Reg. 57,292 (Dec. 8, 1975) ...................................................................................... 17

*Over-the-Counter Nighttime Sleep-Aid and Stimulant Products*,
43 Fed. Reg. 25,544 (June 13, 1978)..................................................................................... 17

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF ISSUES TO BE DECIDED

Whether Plaintiffs' Second Amended Complaint states a claim upon which relief can be granted.

### INTRODUCTION

This Court previously dismissed Plaintiffs Stephen Sneed's and Nickolas Cannon's claims that P&G's ZzzQuil Nighttime Sleep Aid medicine is mislabeled due to its "non-habit forming" representation. This Court found an earlier version of Plaintiffs' complaint defective because Plaintiffs "allege[d] that P&G has made false or deceptive statements, then cite[d] materials in support that do not actually demonstrate that ZzzQuil or diphenhydramine can actually lead to habit formation when used over prolonged periods." ECF No. 45 ("Order") at 13–14.

Although this Court granted Plaintiffs leave to amend, their Second Amended Complaint suffers from the same defect that led this Court to dismiss their prior complaint. None of the newly-added sources nor the "expert" declaration that Plaintiffs reference in their Complaint discusses—or even mentions—the ZzzQuil medicine. The sources that do discuss diphenhydramine largely examine instances in which users took far more of the medicine than what the FDA has indicated is safe—including double or even triple the recommended dosage—and their sources discuss individuals who ingested "a potentially lethal amount of diphenhydramine" or those who used it as part of a suicide attempt. Plainly, such sources cannot be used to establish that it is plausible that ZzzQuil could be habit-forming when used as the FDA has directed—in other words, how a reasonable consumer would interpret the packaging.

This Court can also dismiss Plaintiffs' claims as preempted by federal law. P&G acknowledges that this Court initially concluded otherwise, based on its review "of the tentative final monograph and the final monograph." Order at 8. But the full regulatory history confirms that the FDA has already considered the question of whether diphenhydramine can be habit forming when used as directed and has concluded that it is not. Indeed, the FDA expressly approved of the "non habit forming" representation when that language was submitted to it in connection with new drug applications. *See* Req. for Judicial Notice ("RJN") Ex. 1, Letter from Marvin Seife to Halsey Drug Co. (June 5, 1986) RJN Ex. 2, Letter from Marvin Seife to Richardson-Vicks, Inc. (Jan. 14, 1987). The FDA also

published a report in 2007 reaffirming its long-held view that "OTC sleep aids are non-habit-forming." RJN Ex. 3, U.S. Food & Drug Administration, *Side Effects of Sleep Drugs* (July 31, 2007), https://tinyurl.com/4u2t2dtd.[1]  The FDA's repeated examination of this subject and its refusal to issue regulations prohibiting the use of the "non-habit forming" representation prevents Plaintiffs from using state law to impose the same requirement.  Congress has expressly preempted Plaintiffs' attempt to use state law in this manner, because it is nothing more than an attempt to impose "any requirement" "that is different from or in addition to, or that is otherwise not identical with, a requirement" of federal law.  21 U.S.C. § 379r(a)(2).

For these reasons and the additional reasons set forth below, this Court should dismiss the Second Amended Complaint with prejudice.

## BACKGROUND

**A.     Plaintiffs' Allegations And The Vicks ZzzQuil Nighttime Sleep-Aid Medicine.**

Plaintiff Sneed alleges he purchased ZzzQuil in the Calming Vanilla Cherry flavored liquid form, SAC ¶ 9(b), the label of which appears as Exhibits 1-2A and 1-2B to the Second Amended Complaint (ECF No. 47-1 at 4–7).  Plaintiff Cannon alleges he purchased ZzzQuil liquid-capsule pills, SAC ¶ 10(b), the label of which appears as Exhibit 1-5I to the Second Amended Complaint (ECF No. 47-1 at 42–43).

The medicine purchased by Plaintiffs each directs that a dose of ZzzQuil contains 50 mg of diphenhydramine, the medicine's active ingredient (sometimes referred to as "DPH").  SAC Ex. 1-2A, 1-5I.  The packages state that the medicine should be used "for the relief of occasional sleeplessness" and should be taken only once per day.  *Id.*  The packages also warn users that they should "stop use and ask a doctor if sleeplessness persists continuously for more than 2 weeks."[2]  *Id.*

---

[1] "Public records and information on government agency websites are properly subject to judicial notice."  *Wilson v. Frito-Lay N. Am., Inc.*, 260 F. Supp. 3d 1202, 1206 (N.D. Cal. 2017) (Tigar, J.).

[2] Although this Court's prior order thought that a consumer needed to "search a weblink on the back label" to view the full product package, Order at 12, that is not accurate.  P&G referenced the weblink because Exhibit 1-2A does not depict the full product package available to consumers.  The cited website displays the full physical product package available to consumers, and it makes clear that consumers *do* have the relevant directions when consumers peel back the label.  P&G cited the website

This lawsuit turns on Plaintiffs' contention that P&G "'falsely and misleadingly advertises, labels, and packages certain' of its ZzzQuil Nighttime Sleep Aid products as 'Non-Habit Forming.'" Order at 2. Plaintiffs nevertheless believe that ZzzQuil's active ingredient, diphenhydramine, "is an ingredient that can lead consumers to frequently use the Product over a prolonged period." SAC ¶ 3.

**B.       This Court Dismisses Plaintiffs' First Amended Complaint.**

This Court dismissed Plaintiffs' First Amended Complaint because it did "not include[] any evidence that plausibly supports their claim." Order at 14. This Court observed that "[n]one of the articles cited in the first amended complaint support Plaintiffs' claim that 'Diphenhydramine HCI [sic] users are at risk of habitually using those products.'" *Id.* at 12 (quoting ECF No. 23, ¶ 25) (sic notation in original). "[O]nly one source" that Plaintiffs cited was "offered to substantiate the claims at the center of this lawsuit: whether ZzzQuil products and diphenhydramine are capable of causing habit formation when used over a prolonged period of time." *Id.* This Court reviewed that article and determined that it "d[id] not include any citations to clinical studies concerning diphenhydramine and habit formation." *Id.* at 13. Nor did the article "provide statistics regarding consumers who have become addicted to sleep aids after prolonged use." *Id.* Instead, the article only "reference[d] a single consumer," and included a quote that "hardly move[d] the needle in support of Plaintiffs['] claims." *Id.*

As a result, this Court dismissed Plaintiffs' claims because "[t]he sources that Plaintiffs cite (or, in this case, fail to cite) to support th[eir] claim go straight to the question of whether their claims have facial plausibility." *Id.* "Simply put," this Court said, "Plaintiffs cannot allege that P&G has made false or deceptive statements, then cite materials in support that do not actually demonstrate that ZzzQuil or diphenhydramine can actually lead to habit formation when used over prolonged periods." *Id.* at 13. At bottom, "Plaintiffs [did] not include[] any evidence that plausibly supports their claim," and "[c]ourts have not hesitated to dismiss claims where evidence does not support the claims that plaintiffs have pled." *Id.* at 14. On this basis, this Court dismissed Plaintiffs' claims for violations of California's Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), and Consumers Legal Remedies

merely to provide an accurate image of the full label—not to suggest that consumers must access the website to see these directions.

Act ("CLRA") and for breach of warranty and unjust enrichment. *Id.* at 13–16. But this Court granted Plaintiffs leave to file an amended complaint. *Id.* at 17–18.

This Court also dismissed two other sets of claims on jurisdictional grounds: (i) as to the claims by the New York plaintiff for violations of New York law, this Court held that it lacked personal jurisdiction over those claims, *id.* at 6–7; (ii) as to Plaintiffs' challenge to certain statements on P&G's website, this Court dismissed the claims for lack of Article III standing because no plaintiff alleged they relied on or saw any of P&G's digital advertisements, *id.* at 16-17.

### C.    Plaintiffs' Second Amended Complaint.

In their Second Amended Complaint, Plaintiffs continue to speculate that the "non-habit forming" representation is misleading. They say this is so even though the Second Amended Complaint offers no factual allegations about any person who has taken the ZzzQuil medicine as directed and has, in fact, developed a habit of using ZzzQuil. To be sure, each Plaintiff adds the conclusory assertion that "[a]fter using the Product, Plaintiff formed a habit of relying on it to fall asleep." SAC ¶¶ 9(d), 10(d). Plaintiffs offer no further details about their experiences with ZzzQuil, such as how often they used the product or at what dosage they used it before they allegedly formed a habit. These conclusory allegations are also inconsistent with their purchase histories, as each Plaintiff alleges they purchased ZzzQuil only once. *Id.* ¶¶ 9(b), 10(b).

The Second Amended Complaint adds references to sixteen additional sources in an attempt to bolster Plaintiffs' claim that ZzzQuil's "non-habit forming" representation is false or misleading. *See id.* ¶¶ 15 n.12; 16 nn.16, 18; 27 n.30; 28 n.33; 29 nn.34, 38, 39; 32 n.42; 34 n.44. None of these newly added sources mentions ZzzQuil, and several do not even focus on diphenhydramine at all. Others include anecdotal stories and statistics about individuals who misused or abused diphenhydramine-based products and experienced negative health effects as a result. A few of Plaintiffs' sources do examine diphenhydramine's effects on testing participants, but as discussed below, these sources rely on individuals (or animal subjects) who were provided a much greater dose of diphenhydramine than the 50 mg once daily dosage that is directed on ZzzQuil's label.

Plaintiffs also include a declaration from a medical toxicologist and emergency physician, Dr. Antonia Nemanich (ECF No. 47-5) ("Nemanich Decl."), and their Second Amended Complaint relies

heavily on her declaration, *see* SAC ¶¶ 30–36.  Dr. Nemanich co-authored one of the articles cited in the Second Amended Complaint, which reviewed data about "intentional DPH exposures" and "sought to understand" "what proportion of intentional DPH ingestions are due to suicidal intent versus intentional misuse or abuse."[3]  According to Dr. Nemanich, "the inherent properties of diphenhydramine, *combined with the documented misuse patterns*, directly contradict any claim that it is 'non-habit forming.'"  Nemanich Decl. ¶ 9 (emphasis added).  Although Dr. Nemanich avers that she has "personally treated several patients who meet the DSM-V criteria for dependence as well as use disorder based on their pattern of diphenhydramine use," *id.* ¶ 11, she does not declare that any of her patients used ZzzQuil, that any of her patients developed a habit of using diphenhydramine within a two-week period, or that she treated patients who used diphenhydramine in the appropriate dosage, *i.e.* 50 mg once daily.

In total, the Second Amended Complaint asserts five claims:  three California statutory claims under the UCL, FAL, and CLRA (Counts 1–3), a breach of warranty claim (Count 4), and an unjust enrichment claim (Count 5).  SAC ¶¶ 59–137.  Plaintiffs seek monetary relief to recover both the purported price premium they paid for ZzzQuil and the full purchase price, as well as injunctive relief to prevent P&G's further use of the alleged misrepresentation.  *Id.* ¶ 6 (seeking price premium); *id.* ¶¶ 119, 127 (seeking full purchase price).

## PROCEDURAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must "state[] a plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  Mere "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not enough. *Id.* at 678.  Instead, a plaintiff must allege "sufficient factual matter" that, taken as true, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* These "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545 (citation omitted).  "Where a complaint pleads facts that are 'merely

---

[3] RJN Ex. 4, Antonia Nemanich, et al., *Increased rates of diphenhydramine overdose, abuse, and misuse in the United States, 2005–2016*, 59 Clinical Toxicology 1 (2021), cited at SAC ¶ 28 n.33.

consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

**ARGUMENT**

**I.      PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE THAT THE "NON-HABIT FORMING" REPRESENTATION IS FALSE.**

All of Plaintiffs' claims require proof that P&G made a false or deceptive statement when it included the "non-habit forming" representation on the ZzzQuil packaging. *See* Order at 10–11 (addressing Plaintiffs' UCL, FAL, and CLRA claims); *id.* at 15 (addressing Plaintiffs' warranty claims); *id.* at 16 (addressing Plaintiffs' unjust enrichment claim). As this Court previously observed, a reasonable consumer would consult "the FDA-mandated 'Directions' on the back of an over-the-counter product." Order at 11 (cleaned up). As a result, to prove that the "non-habit forming" representation is false, all of Plaintiffs' claims require them to prove that diphenhydramine is capable of causing habits when used as directed, *i.e.*, when taken once per day in a 50 mg dose for up to two weeks. This means that Plaintiffs must plausibly allege that a consumer can "become addicted to the product" even though they used the product as directed, Order at 11, meaning they must allege that they developed a habit of taking diphenhydramine within the two-week period before they are instructed to "stop use and ask a doctor if sleeplessness persists continuously." ECF No. 47-1, Exs. 1-2B, 1-4C, 1-5I; Order at 11. Otherwise, Plaintiffs have failed to allege that P&G has done anything to mislead "a significant portion of the general consuming public or of targeted consumers, *acting reasonably in the circumstances*." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (emphasis added).

The Second Amended Complaint fails to cure the central defect that this Court previously identified: "Plaintiffs cannot allege that P&G has made false or deceptive statements, then cite materials in support that do not actually demonstrate that ZzzQuil or diphenhydramine can actually lead to habit formation when used over prolonged periods." Order at 13. Plaintiffs' attempt to fix this fatal problem includes allegations based on their experiences, references to additional third-party sources, and a declaration from a toxicologist to try to establish the plausibility of their claims. But Plaintiffs' efforts to overwhelm the Court with citations to numerous inapposite studies—none of which mention ZzzQuil—does not establish that ZzzQuil is capable of being habit forming when used as directed.

**A.      Plaintiffs' Own Alleged Experiences Do Not Establish That ZzzQuil is Habit-Forming When Used As Directed.**

For the first time in this case, Plaintiffs allege in conclusory fashion that "[a]fter using the Product, Plaintiff formed a habit of relying on it to fall asleep."  SAC ¶¶ 9(d), 10(d).  This Court should give no weight to these allegations because "[n]aked assertions and conclusory statements do not qualify as well-pled factual allegations." *Haynes v. Hanson*, 2013 WL 1390387, at *2 (N.D. Cal. 2013) (Tigar, J.).  The Second Amended Complaint fails to provide any further details about Plaintiffs' use of ZzzQuill or the purported habits they developed as a result.

Other allegations in the Second Amended Complaint refute the plausibility that Plaintiffs developed a habit.  Presumably, if any Plaintiff developed a habit, they would have purchased ZzzQuill multiple times.  Yet each Plaintiff alleges they only purchased ZzzQuill once. *See* SAC ¶¶ 9(b), 10(b).  "[G]eneral, conclusory allegations need not be credited when they are belied by more specific allegations of the complaint." *Tapia Carmona v. Cnty. of San Mateo*, 2019 WL 4345973, at *9 (N.D. Cal. 2019) (cleaned up).

**B.      Plaintiffs' New Sources Do Not Plausibly Establish That ZzzQuil is Habit-Forming When Used As Directed.**

Plaintiffs' newly added sources can be divided into four categories:  (1) those that do not focus on diphenhydramine at all; (2) those that rely on anecdotal experiences; (3) those that attempt to examine overdose and abuse of diphenhydramine; and (4) those that examine diphenhydramine's effects when it is taken as dosage levels well in excess of the FDA's and ZzzQuil's directed dosage, *i.e.* 50 mg once per day.  When a plaintiff elects to rely on third-party sources such as studies to establish a claim, "a study's conclusion must *directly address* the misrepresentation it is cited to debunk." *Martin v. Doctor's Best, Inc.*, 2023 WL 6370230, at *6 (C.D. Cal. 2023) (emphasis added) (cleaned up).  Nothing within these sources, however, establishes diphenhydramine is capable of causing consumers to develop any unwanted habits when taken at a 50 mg once per day for up to a two-week period.  As a result, there is nothing in the Second Amended Complaint to suggest it is plausible that ZzzQuil's "non-habit forming" representation would mislead "a significant portion of the general consuming public or of targeted consumers, acting reasonably under the circumstances." *Ebner*, 838 F.3d at 965.

***Sources that do not focus on diphenhydramine.***  Four of Plaintiffs' newly added sources do not focus on diphenhydramine.  Three of these sources do not mention diphenhydramine at all:  two simply discuss the role that testing of rats, mice, and rodents play in medical research,[4] while the third examines whether "motivation still plays a role in habitual behavior."[5]  RJN Ex. 7 at 1.  The fourth source "investigate[d] the prevalence of misuse, abuse of, and dependence" on certain non-prescription drugs.[6]  RJN Ex. 8 at 2.  But diphenhydramine was not one of the "studied drugs"; rather, this study only mentions diphenhydramine as a potential comparison basis to one of the "studied drugs."  *See id.* at 6.  This Court can therefore disregard these four sources, in the same way that the Order disregarded sources in the First Amended Complaint that did not discuss diphenhydramine.  *See* Order at 12.

***Sources based on anecdotes.***  As to the sources that actually discuss diphenhydramine, none analyzed the relevant question here:  whether taking diphenhydramine in a 50 mg dose once a day can cause a consumer to form a habit at the end of a two-week period.

Most of Plaintiffs' new sources involve only anecdotal evidence of individuals who misused or abused diphenhydramine, which this Court previously found was not enough to establish Plaintiffs' allegations were plausible.  *See* Order at 13 (discounting article that "references a single consumer" and did not "provide statistics regarding consumers who have become addicted to sleep aids after prolonged use").  For example:

- The Saran article focuses on a man "with multiple previous admissions for presumed toxic ingestions," who was found to have "[a] history of chronic DPH abuse … related to acute intoxications and overdose from DPH" and was treated for withdrawal.  This article was

---

[4] *See* RJN Ex. 5, Elizabeth C. Bryda, *The Mighty Mouse: The Impact of Rodents on Advances in Biomedical Research*, 110 Missouri Med. 207 (2013), cited at SAC ¶ 16 n.16; RJN Ex. 6, Bart Ellenbroek & Jiun Youn, *Rodent Models in Neuroscience Research: Is it a Rat Race?*, 9 Disease & Model Mechanisms 1079 (Oct. 1, 2016), cited at SAC ¶ 16 n.18.

[5] RJN Ex. 7, Zsuzsika Sjoerds, et al., *The role of habits and motivation in human drug addiction: a reflection*, 5 Frontiers in Psychiatry 1 (2014), cited at SAC ¶ 27 n.30.

[6] RJN Ex. 8, Anne Roussin, et al., *Misuse and Dependence on Non-Prescription Codeine Analgesics or Sedative H1 Antihistamines by Adults: A Cross-Sectional Investigation in France*, 8 PLOS ONE 1 (2013), cited at SAC ¶ 29 n.39.

DEFENDANT'S NOTICE OF MOTION AND    8    Civil Case No. 4:23-cv-05443-JST
MOTION TO DISMISS SECOND AMENDED
COMPLAINT

published to help doctors "consider DPH withdrawal in the differential diagnosis of acute onset mental status changes."[7]  RJN Ex. 9 at 439–40.

- The Craig article discussed three patients who had been ingesting 1250 mg/day, up to 2500 mg/day, and up to 3750 mg/day of dimenhydrinate "to get high," and sought to alert physicians to the possibility of dimenhydrinate and diphenhydramine abuse "particularly in cases of unexplained persistent nausea and vomiting."[8]  RJN Ex. 10 at 970–73.

- The Bonham article discussed the medical condition of a woman who had been ingesting "1.5 g of diphenhydramine a day," which they described as "a potentially lethal amount of diphenhydramine."[9]  RJN Ex. 11 at 98.

- The Chen article involved a woman who injected "up to 450 mg of IM [intramuscular] DPH per day."[10]  RJN Ex. 12 at 325.

- The Dinndorf article examined five individuals who used significant amounts of diphenhydramine, including one who took 50 mg of diphenhydramine every 1.5 to 2 hours.[11]  RJN Ex. 13 at 293–94.

- The Nolen article examined a man "who was using DPH 500 mg or more at night for >10 years as a sleep aid and anxiolytic."[12]  RJN Ex. 14 at 1279–80.

---

[7] RJN Ex. 9, Jagroop S. Saran, et al., *Chronic diphenhydramine abuse and withdrawal*, 7 Neurology: Clinical Practice 439 (2017), cited at SAC ¶ 29 n.34.

[8] RJN Ex. 10, David F. Craig & Clive S. Mellor, *Dimenhydrinate dependence and withdrawal*, 142 Can. Med. Assoc. J. 970 (1990), cited at SAC ¶ 29 n.34.

[9] RJN Ex. 11, Caroline Bonham & Florian Birkmayer, *Severe Diphenhydramine Dependence and Withdrawal: Case Report*, 5 J. Dual Diagnosis 97 (2009), cited at SAC ¶ 29 n.39.

[10] RJN Ex. 12, T.Y. Chen, et al, *Diphenhydramine dependence through deep intramuscular injection resulting in myonecrosis and prolonged QT interval*, 39 J. Clin. Pharm. Therapeutics 325 (2014), cited at SAC ¶ 32 n.42.

[11] RJN Ex. 13, Patricia A. Dinndorf, et al, *Risk of abuse of diphenhydramine in children and adolescents with chronic illness*, 133 J. Pediatrics 293 (1998), cited at SAC ¶ 34 n.44.

[12] RJN Ex. 14, Amy Nolen, et al., *Diphenhydramine Use Disorder and Complicated Withdrawal in a Palliative Care Patient*, 23 J. of Palliative Med. 1279 (2020), cited at SAC ¶ 34 n.44.

- The Thomas article discussed a woman who "was taking thirty 50 mg tablets each day."[13]  RJN Ex. 15 at 103.

Anecdotal reports of those who abuse diphenhydramine—many of which were published to alert physicians to the possibility that certain symptoms could be attributed to diphenhydramine abuse—cannot be used to establish that a reasonable consumer who uses the product as directed would be mislead by the "non-habit forming" representation.  *See Moore*, 4 F.4th at 882–84 ("[T]he general principle [is] that deceptive advertising claims should take into account all the information available to consumers and the context in which that information is provided and used." (citation omitted)).

***Sources collecting statistical evidence of significant abuse of diphenhydramine.***  Other sources contain statistical evidence, but they do not help Plaintiffs' argument that there is anything misleading about the "non-habit forming" representation because they simply analyze situations involving intentional misuse of diphenhydramine.  For example, the Nemanich article "sought to understand whether *intentional DPH exposures* are changing over time and across age groups, what proportion of intentional DPH ingestions are *due to suicidal intent* versus *intentional misuse or abuse*, and whether adverse effects as a result of these exposures have worsened over time."[14]  RJN Ex. 4 at 1002 (emphasis added).  Likewise, the Schifano article examined the literature about over-the-counter drugs' propensity for dependence.  But when discussing diphenhydramine, that article observed only that "reported cases of DPH dependence have resulted from usage of large doses (often over 1,000 mg per day) over periods of months or years."[15]  RJN Ex. 16 at 6.  In other words, there is no indication of diphenhydramine dependence when the product is used as directed.  Sources that involve extreme examples of intentional abuse or misuse of diphenhydramine cannot help establish that ZzzQuil can be "habit forming" when used as a reasonable consumer would be expected to use the medicine.

---

[13] RJN Ex. 15, A. Thomas, *Diphenhydramine abuse and detoxification: a brief review and care report*, 23 J. Psychopharmacology 101 (2009), cited at SAC ¶ 34 n.44.

[14] RJN Ex. 4, Antonia Nemanich, et a., *Increased rates of diphenhydramine overdose, abuse, and misuse in the United States, 2005–2016*, 59 Clinical Toxicology 1 (2021), cited at SAC ¶ 28 n.33.

[15] RJN Ex. 16, Fabrizio Schifano, et al., *Focus on Over-the-Counter Drugs' Misuse: A Systematic Review on Antihistamines, Cough Medicines, and Decongestants*, 12 Frontiers in Psychiatry 1 (2021), cited at SAC ¶ 29 n.34.

***Studies based on excessive dosing of diphenhydramine.***  The remaining studies attempt to analyze certain effects of diphenhydramine, including its neurochemical effects and effects on performance.  But each study involved exposing test subjects to diphenhydramine at levels that far exceed the 50 mg daily dose in ZzzQuil, and therefore cannot establish that ZzzQuil could be habit-forming when used as directed.

For example, in the Tanda study, the researchers claimed they detected "a cocaine-like pattern of stimulation of [dopamine] transmission" after they provided intravenous doses of diphenhydramine (and another compound) to rats in the amount of 1.0-3.0 mg/kg.[16]  RJN Ex. 17 at 147.  The study's methodology shows that the circumstances of this rat testing is nothing like how human consumers experience ZzzQuil:  it administered diphenhydramine in IV form (rather than oral form through tablets or liquid), and the dosage of 1.0-3.0 mg/kg is not comparable to the 50 mg dosage in ZzzQuil given that the average American adult weighs 90.6 kg (men) or 77.5 kg (women).[17]

The human studies cited by Plaintiffs do not address the relevant question here, either, because they provided participants with double or triple the FDA-mandated dose.  In the Schweitzer study, participants were provided three 50 mg doses of diphenhydramine for each day of the study.[18]  RJN Ex. 18 at 717.  In the Richardson study, participants were provided two 50 mg doses of diphenhydramine each day and slept in the researchers' sleep laboratory.[19]  RJN Ex. 19 at 512.  Neither study makes any connection between diphenhydramine and "habit formation."  Nor does either study indicate that diphenhydramine could lead to "habit formation" when it is used at the dosage that FDA has directed and that is indicated on ZzzQuil's label: 50 mg once per day. Indeed, the studies themselves recognized

---

[16] RJN Ex. 17, Gianluigi Tanda, et al., *Cocaine-Like Neurochemical Effects of Antihistaminic Medications*, 106 J. Neurochem. 147 (2008), cited at SAC ¶ 15 n.12.

[17] National Center of Health Statistics, Anthropometric Reference Data for Children and Adults: United States, 2015–2018 (Jan. 2021), https://www.cdc.gov/nchs/data/series/sr_03/sr03-046-508.pdf.

[18] RJN Ex. 18, Paula K. Schweitzer, et al., *Sleepiness and performance during three-day administration of cetirizine or diphenhydramine*, 94 J. Allergy Clinical Immunology 716 (1994), cited at SAC ¶ 29 n.38.

[19] RJN Ex. 19, Gary S. Richardson, et al., *Tolerance to Daytime Sedative Effects of H1 Antihistamines*, 22 J. of Clin. Psychopharmacology 511 (2022), cited at SAC ¶ 32 n.42.

that the dosing regimen could significantly impact the relevant effects: the Schweitzer study noted that "many patients do not take antihistamines on a daily basis or on a multiple-dosing schedule," RJN Ex. 18 at 723, and the Richardson study acknowledged that "the precise dosing regimen used may [be] important to the habituation process." RJN Ex. 19 at 514. These studies therefore cannot help determine the effect of ZzzQuil when taken in a single 50 mg dosage.

This mismatch between Plaintiffs' sources and their allegations is fatal to Plaintiffs' attempt to state a viable claim. "When it comes to the plausibility analysis, the essential inquiry depends upon a comparison of the match 'between the representations at issue and the evidence that allegedly debunks them.'" *Vigil v. Gen. Nutrition Corp.*, 2015 WL 8056178, at *6 (S.D. Cal. 2015) (cleaned up); *see also Housey v. Procter & Gamble Co.*, 2022 WL 874731, at *6 (S.D.N.Y. 2022), *aff'd*, 2022 WL 17844403 (2d Cir. 2022) ("Where a plaintiff has chosen to use scientific evidence to state her claims, and that evidence does not support her claims, plaintiff has not plausibly pled her claims."); *Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 138 (E.D.N.Y. 2015) ("[W]here plaintiffs point to scientific studies that they allege actually disprove a product's claims, such a stark disconnect between the scientific studies and the claims made about [the product's] benefits is fatal to plaintiffs' complaint."); *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 457–58 (E.D.N.Y. 2013) (similar). When, as here, there is "a mismatch between [defendant's challenged] representations and the studies provided by [p]laintiff," their claims cannot proceed. *Vigil*, 2015 WL 8056178, at *6; *see also Moore*, 4 F.4th at 882 (insufficient to show that a label "might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner").

Plaintiffs' cited sources are insufficient under these standards. None of the studies even mentions ZzzQuil or its propensity for habit formation. And none discusses the effects of diphenhydramine when it is used at the 50 mg once daily dosage. This matters because, as one of the cited studies acknowledges, "the precise dosing regimen used may [be] important to the habituation process." RJN Ex. 19 at 514. Other courts have disregarded third-party sources when, as here, it "only concern[ed] the effects of [ingredient], but does not address whether [d]efendant's *[p]roducts* deliver the claimed benefits." *Otto v. Abbott Labs., Inc.*, 2013 WL 12132064, at *4 (C.D. Cal. 2013) (emphasis in original). This Court should do the same.

**C.    The Nemanich Declaration Does Not Plausibly Establish That ZzzQuil is Habit-Forming When Used As Directed.**

Plaintiffs also rely on a declaration from Dr. Antonia Nemanich, a medical toxicologist who authored one of the aforementioned articles. That article reviewed data about overdose, misuse, and abuse; it did not discuss ZzzQuil, and it did not assess whether there are safety risks associated with diphenhydramine when it is used as the FDA has directed. *See* RJN Ex. 4 at 1002, 1005–08; *see also supra* at 10. Dr. Nemanich's declaration, too, fails to show that ZzzQuil can be "habit-forming."

Relying on many of the same sources described above, Dr. Nemanich asserts that diphenhydramine "can lead to habitual use and has a significant potential for abuse and misuse." Nemanich Decl. ¶ 7 (citing RJN Ex. 12 & RJN Ex. 4). She refers to the potential for "tolerance development" and ultimately concludes that the "non-habit forming" representation is false due to "the inherent properties of diphenhydramine, *combined with the documented misuse patterns*." *Id.* ¶ 9 (emphasis added). Although Dr. Nemanich asserts she has treated "several patients who meet the DSM-V criteria for dependence as well as use disorder based on their pattern of diphenhydramine use," *id.* ¶ 11, she does not allege that any of these patients used ZzzQuil, or that their habitual use of diphenhydramine was caused by these patients first taking the medicine in the directed dosage.

Dr. Nemanich's declaration challenging the "non-habit forming" representation thus rests on the same flaws as several of Plaintiffs' cited sources—any purported habits do not occur when the product is used as a reasonable consumer would (*i.e.*, as directed), but only if consumers misuse and abuse diphenhydramine. And nothing in the Second Amended Complaint or the underlying sources supports the proposition that such behavior is anything more than isolated occurrences, much less that it is widespread enough that it could be considered the behavior of a reasonable consumer. Indeed, the FDA has rejected such a conclusion: when it approved diphenhydramine in the final monograph, the FDA acknowledged awareness of isolated instances of diphenhydramine abuse, but determined these reports "do not indicate a widespread problem, nor do they show any correlation between this abuse and OTC marketing of the drug." *Nighttime Sleep-Aid Drug Products for Over-the-Counter Human Use; Final Monograph*, 54 Fed. Reg. 6,814, 6,825 (Feb. 14, 1989). Dr. Nemanich's discussion of alleged habit formation cites the same sources mentioned in the Second Amended Complaint, and it is off-base for the

same reasons discussed above.  Dr. Nemanich does not assert that over-the-counter nighttime sleep-aids, like ZzzQuil, can be "habit forming" when used in the manner in which reasonable consumers would use it—the only manner that is relevant to this litigation—at the 50 mg once daily dosage.  *See Otto*, 2013 WL 12132064, at *4.

As this Court recognized, federal courts "have not hesitated to dismiss claims where evidence does not support the claims that plaintiffs have pled."  Order at 14.  The Nemanich Declaration thus suffers from the same defects that caused this Court to dismiss a previous version of the Complaint and that have caused the Ninth Circuit and numerous other courts to reject plaintiffs' claims when their proffered evidence was insufficient.  *See, e.g.*, *Aloudi v. Intramedic Res. Grp., LLC*, 729 F. App'x 514, 516 (9th Cir. 2017) (affirming dismissal of complaint where study and allegations did not "involve[] scientific testing of the actual [challenged] product or a product with the same active ingredients as [challenged product], in a dose similar to that in [challenged product]"); *Tubbs v. AdvoCare Int'l, L.P.*, 785 F. App'x 396, 397 (9th Cir. 2019) (affirming dismissal of complaint that relied on inapposite study and expert report because they failed to provide "sufficient detail to infer falsity" about challenged marketing statements and thus failed to show that reasonable consumer would be misled); *Doctor's Best*, 2023 WL 6370230, at *6 (dismissing complaint because "cited studies did not test the [challenged product] itself or comparable [products] with the same active ingredients in similar doses" and because studies "did not analyze" challenged representations and therefore "do not contradict [d]efendant's representation about the [product]"); *Martin v. Onnit Labs, Inc.*, 2023 WL 8190712, at *7 (C.D. Cal. 2023) (dismissing complaint because plaintiff's "reliance on [studies] are too 'disconnected' from [d]efendant's claim about the [product] to survive" motion to dismiss).

This Court previously observed that "Plaintiffs cannot allege that P&G has made false or deceptive statements, then cite materials in support that do not actually demonstrate that ZzzQuil or diphenhydramine can actually lead to habit formation when used over prolonged periods."  Order at 13.  Nothing in the Second Amended Complaint requires a different result.

## II.      PLAINTIFFS' CLAIMS ARE PREEMPTED BY FEDERAL LAW.

The FDCA prohibits Plaintiffs from seeking to use state law to impose "any requirement" "that is different from or in addition to, or that is otherwise not identical with, a requirement" of federal law.

21 U.S.C. § 379r.  Plaintiffs urged this Court to reject P&G's preemption defense because there was "no specific language within the final monograph or corresponding regulation that expressly permit the Challenged representation," and this Court ultimately declined to find preemption because "the final monograph makes no mention of any 'non-habit forming' claims at all."  Order at 7-8.  The scope of FDCA preemption is not so limited.  But even if it was, the Order overlooked the FDA's extensive regulatory history repeatedly finding diphenhydramine to be non-habit forming and approving marketing the medicine as such.[20]

A long line of courts, both in the Ninth Circuit and elsewhere, have held that federal law preempts a plaintiff's claim that a product is false or misleading if the FDA has actually considered or regulated the subject matter of the labeling issue raised by the plaintiff in some way, even if the additional representation the plaintiff would require is not inconsistent with federal labeling requirements.  For example, in *Seale v. GSK Consumer Health, Inc.*, __ F. Supp. 3d __, 2024 WL 1040854, at *6 (C.D. Cal. Feb. 27, 2024), the plaintiff sought to ban the defendant from labeling the product as being suitable for children if it was pharmacologically the same as an adult product.  But the FDA had already regulated the subject matter of plaintiffs' claims (*i.e.*, what labeling is required on children's medicine), and Section 379r preempted the plaintiffs' claims because the relevant regulation "does not impose any requirement or prohibition like those that Plaintiff seeks."  *Id.*  Similarly, in *Goldstein v. Walmart, Inc.*, 637 F. Supp. 3d 95, 99 (S.D.N.Y. 2022), the plaintiff sought to ban the defendant from labeling the medicine as "non-drowsy."  Although the FDA had not expressly approved of that language, plaintiffs' claims were preempted because the FDA had "considered whether" the medicine could cause drowsiness.  *Id.* at 111.  This Court likewise has looked to whether the FDA has examined the subject matter of a particular issue rather than whether the FDA has approved the exact phrase on a product label, finding that federal law preempted a challenge to the phrase "rapid release" even though the FDA had only considered the use of the phrase "immediate release."  *Morgan v.*

---

[20] Because Second Amended Complaint "supersedes" Plaintiffs' prior complaint, P&G's request that this Court dismiss this complaint on preemption grounds "is not a motion for reconsideration of the Court's prior order, but, rather, a new motion addressing a newly filed complaint."  *In re Cal. Bail Bond Antitrust Litig.*, 2022 WL 19975276, at *8 (N.D. Cal. 2022).  P&G's preemption defense in this motion is therefore consistent with Civil Local Rule 7-9.  *See id.*

*Albertsons Cos.*, 2023 WL 3607275, at *4–6 (N.D. Cal. 2023) (Tigar, J.) ("[t]he touchstone of preemption under § 379r is the *effect* that a finding of liability on a particular claim would have on the Defendants" (citation omitted) (emphasis in original)); *see also Baker v. Nestle S.A.*, 2019 WL 960204, at *1–2 (C.D. Cal. 2019) (finding claims preempted even though FDA did not address specific representation at issue because regulations allowed for representation that was similar to the representation).

Taken together, these cases illustrate that "[w]here federal law specifically regulates the subject matter of a plaintiff's state law claims, and those claims seek to impose requirements not identical to federal requirements, those state law claims are preempted." *Canale v. Colgate-Palmolive Co.*, 258 F. Supp. 3d 312, 320 (S.D.N.Y. 2017); *see also Bimont v. Unilever U.S., Inc.*, 2015 WL 5256988, at *2–3 (S.D.N.Y. 2015) (recognizing that, if the FDA "regulates a given subject matter," all non-identical state laws applicable to drugs or cosmetics "within that subject matter" may be preempted). In other words, even if the final monograph does not address the precise language, preemption applies as long as the FDA "had clearly addressed the substance of the claims at issue." *Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 137 (E.D.N.Y. 2018); *see also Hollins v. Walmart Inc.*, 67 F.4th 1011, 1013–16 (9th Cir. 2023) (interpreting similar express preemption provision to provide that "a state-law misbranding claim that would allow a state to impose requirements different from those permitted under the FDCA" is preempted (cleaned up)); *Sapienza v. Albertson's Cos.*, 2022 WL 17404919, at *3 (D. Mass. 2022) (holding claims were preempted because FDA's monograph addressed "the subject matter of [the plaintiff's] state-law claims—even if the wordings slightly differ").

For three reasons, the FDA *has* already considered whether diphenhydramine could be habit forming and has repeatedly concluded that the medicine has no such effect. Because no federal law prohibits manufacturers from marketing medicine containing diphenhydramine as "non-habit forming," Plaintiffs' claims are preempted under the plain language of Section 379r.

*First*, the regulatory history reveals that the FDA closely examined whether diphenhydramine could be habit forming and considered whether to ban manufacturers from marketing the medicine as "non-habit forming." When the monograph process began, the FDA made clear that it would only approve over-the-counter sleep aids if the active ingredients would "be safe in the doses suggested in the

labeling." *Over-the-Counter Drugs*, 40 Fed. Reg. 57,292, 57,296 (Dec. 8, 1975). At that time, the FDA proposal made clear that to obtain approval, any over-the-counter sleep aid "should not be habit-forming or addicting." *Id.* at 57,296. At the tentative final monograph stage, when the FDA had not yet completed its study of diphenhydramine, the FDA expressed its tentative view that "[t]he term 'non-habit-forming' is misleading, undesirable and probably false because it is very hard to prove that any produce with psychotropic activity can be non-habit forming." *Over-the-Counter Nighttime Sleep-Aid and Stimulant Products*, 43 Fed. Reg. 25,544, 25,579 (June 13, 1978). That observation encompassed to *all* over-the-counter nighttime sleep-aids—not just those containing diphenhydramine—because the FDA was still evaluating which active ingredients would ultimately obtain final approval. *See id.* at 25,578–79.

The FDA then reversed course as applied to diphenhydramine more than a decade later. After years of additional studies, "additional data ha[d] been submitted to the OTC drug review to support the safety and effectiveness of diphenhydramine." 54 Fed. Reg. at 6,815; *see also id.* at 6,819 ("Since [the tentative final monograph], the agency has evaluated the results of clinical studies that support the safety and effectiveness of [diphenhydramine] for nighttime sleep-aid use."). The FDA therefore approved diphenhydramine for over-the-counter use, something the agency had previously said it would do only if the medicine was "not be habit-forming or addicting." 40 Fed. Reg. at 57,296. It further did not ban the "non-habit forming" language, even though the tentative final monograph reflects that it considered doing so. Courts have recognized that "state law claims regarding the labeling or packaging of OTC drugs that are not identical to the FDCA are expressly preempted." *Howard v. Alchemee, LLC*, 2024 WL 4272931, at *7 (C.D. Cal. Sept. 19, 2024); *see also Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31, 35–36 (2d Cir. 2020) (FDCA preempts "*any* state law that provides for labeling requirements that are not *exactly the same* as those set forth in the FDCA and its regulations" (emphasis in original)); *Roffman v. Perfect Bar, LLC*, 2022 WL 4021714, at *2 (N.D. Cal. 2022) ("[I]f the FDCA or FDA regulations do not prohibit Defendant's conduct as alleged in the complaint, then [a] Plaintiff['s] state law claims are expressly preempted."); *Gitson v. Trader Joe's Co.*, 2015 WL 9121232, at *1 (N.D. Cal. 2015) ("[S]tate law may only impose liability for what the federal statute proscribes.").

*Second*, in a closely related context, the FDA has expressly approved the "non-habit forming" language on other drugs that contain diphenhydramine. As an alternative to the monograph process, manufacturers have the option to submit a drug application to the FDA seeking approval of both the drug and its proposed packaging. When a New Drug Application ("NDA") is submitted, the FDA undertakes "a long, comprehensive, and costly testing process," and this process requires that "the manufacturer of the new drug must submit and the FDA must approve the exact text in the proposed label." *Rosewolf v. Merck & Co.*, 635 F. Supp. 3d 830, 834 (N.D. Cal. 2022) (cleaned up). After an NDA is approved, the FDA then allows manufacturers to follow the more streamlined Abbreviated New Drug Application ("ANDA") process in which a drug manufacturer "must show that the safety and efficacy labeling proposed is the same as the labeling approved" under the NDA process. *Id.* (cleaned up).

Twice, the FDA has approved through the ANDA process labels for diphenhydramine products that sought to market the product as "non-habit forming." *See* RJN Ex. 1, Letter from Marvin Seife to Halsey Drug Co. (June 5, 1986); RJN Ex. 2, Letter from Marvin Seife to Richardson-Vicks, Inc. (Jan. 14, 1987). Both these products used dosages *greater* than the 50 mg daily dose in ZzzQuill; they involved medicine approved for dosages of two teaspoons (25 mg) every 4 hours, up to 75 mg over 12 hours. *See id.* The FDA's approval of the "non-habit forming" label—on a product that contains a higher dosage of diphenhydramine than ZzzQuill—came *after* it observed in the tentative final monograph that such language might be misleading, showing the FDA had by that time reversed its tentative view as it evaluated additional studies.

*Third*, FDA guidance confirms that the agency has repeatedly reaffirmed that diphenhydramine is not habit-forming when sold over-the-counter in compliance with the monograph dosing requirements. In 2007, the FDA published a consumer information booklet in which it stated that "OTC sleep aids are non-habit-forming." RJN Ex. 3, U.S. Food & Drug Administration, *Side Effects of Sleep Drugs* (July 31, 2007), https://tinyurl.com/4u2t2dtd. Additionally, in the 2016 Consumer Reports article cited in the Second Amended Complaint, an FDA spokesperson is quoted saying that "it is very unlikely that the consumer will become dependent on [an OTC sleep aid]" if the product is used "for two weeks

or less at the labeled OTC dose." RJN Ex. 20, Ginger Skinner, *Can You Get Hooked on Over-the-Counter Sleep Aids?*, Consumer Reports (Dec. 29, 2016), cited at SAC ¶ 14 n.9.

Taken together, these materials indicate that the FDA considered both the possibility that diphenhydramine could be habit-forming and whether manufacturers could market the medicine as "non-habit forming." Plaintiffs, for their part, seek to ban the "non-habit forming" phrase from the product label—something FDA considered, but ultimately declined to do so. "With respect to the labeling of OTC drugs, the whole point of section 379r is that it is not up to private litigants—or judges—to decide what is 'false or misleading.' It is up to the FDA." *Bowling v. Johnson & Johnson*, 65 F. Supp. 3d 371, 377 (S.D.N.Y. 2014); *see also Novotney v. Walgreen Co.*, 2023 WL 4698149, at *5 (N.D. Ill. 2023) (preemption proper if "it is clear that the label in question complies with federal standards by 'advertising accurately' the uses for which the product has been approved as safe and effective" (alterations adopted)); *Goldstein*, 637 F. Supp. 3d at 113 (finding preemption when "there is no particular reason to believe that this Court—or any court in a proceeding involving two litigants— would come to a more informed conclusion regarding the label that should be put on a product than the FDA would after a notice-and-comment proceeding in which all interested parties have an opportunity to participate"). Plaintiffs should not be permitted to second-guess the FDA's conclusion that medicine like ZzzQuil is "non-habit forming."

## III. PLAINTIFFS' CLAIMS FAIL FOR ADDITIONAL REASONS.

In addition to the defects identified above, the warranty and unjust enrichment claims should be dismissed for additional reasons.

### A. The Warranty Claim Should Be Dismissed.

#### 1. Plaintiffs Fail To State A Claim For Breach Of Express Warranty.

"To state a claim for breach of express warranty" under California law, "the plaintiff must show (1) the seller made an affirmation of fact or promise or provided a description of its goods; (2) the promise or description formed part of the basis of the bargain; (3) the express warranty was breached; and (4) the breach caused injury to the plaintiff." *Nacarino v. KSF Acquisition Corp.*, 642 F. Supp. 3d 1074, 1085–86 (N.D. Cal. 2022); Cal. Comm. Code § 2313. Plaintiffs have not done so here.

Plaintiffs' express warranty claim seeks to recover the entire purchase price of the medicine, *see* SAC ¶ 127, but that theory is not viable.  Instead, the measure of damages for an express warranty claim is "the diminution in value between the [product] as warranted and the [product] as sold."  *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 966 (N.D. Cal. 2018).  Plaintiffs have not alleged that ZzzQuil would lose all its value without the "non-habit forming" representation.  As a result, they may not recover "the amount of the purchase price they paid for the Products," which is the only relief they seek under their warranty theory.  SAC ¶ 127.

### 2.    Plaintiffs Fail To State A Claim For Breach of The Implied Warranty of Merchantability.

Count Four of the Second Amended Complaint accuses P&G of violating only Cal. Comm. Code § 2313, which governs "express warranties," not implied warranties.  Cal. Comm. Code § 2313; SAC ¶¶ 122–30.  Count Four can be dismissed for this reason alone.

If this Court construes the Count Four as nevertheless asserting a claim for a violation of the statutory provision governing implied warranties, the Second Amended Complaint still does not state a claim.  This Court previously dismissed Plaintiffs' implied warranty claim because it "rises and falls with express warranty claims brought for the same product."  Order at 15.   It should do the same here.

In any event, "[t]he implied warranty of merchantability requires that consumer goods, among other things, 'are fit for the ordinary purposes for which such goods are used.'"  *In re Natera Prenatal Testing Litig.*, 2023 WL 3370737, at *8 (N.D. Cal. 2023) (Tigar, J.) (quoting Cal. Civil Code § 1791.1(a)(2)).  Plaintiffs have not alleged that ZzzQuil breaches that standard.

*First*, Plaintiffs' claims fail because they did not purchase ZzzQuil directly from P&G, and therefore privity does not exist.  *See* SAC ¶¶ 9(b), 10(b) (alleging purchases from CVS and Walmart).  Under California law, "[p]rivity of contract is a prerequisite … for recovery on a theory of breach of implied warranties of fitness and merchantability," and "there is no privity between the original seller and a subsequent purchaser who is in no way a party to the original sale."  *Blanco v. Baxter Healthcare Corp.*, 158 Cal. App. 4th 1039, 1059 (2008) (citation omitted); *In re Natera*, 2023 WL 3370737, at *9 (explaining privity requirement).  Plaintiffs' allegations do not establish privity with P&G, or that any of the exceptions to the privity requirement might apply.

*Second*, even if privity were not required, Plaintiffs fail to plead that ZzzQuil "lacks even the most basic degree of fitness for ordinary use," which is a required element of their implied warranty claims. *See Viggiano v. Hansen Nat. Corp.*, 944 F. Supp. 2d 877, 896 (C.D. Cal. 2013) (dismissing implied warranty claim because plaintiff did not plead that the product was "contaminated or contained foreign objects" (cleaned up)). Plaintiffs do not allege that ZzzQuil fails to fulfil its ordinary purpose of treating occasional sleeplessness.

**B.    The Unjust Enrichment Claim Fails For Additional Reasons.**

Plaintiffs' unjust enrichment claim should again be dismissed because, as this Court explained previously, "[b]ecause all of Plaintiffs' other claims have been dismissed, Plaintiffs' unjust enrichment claim under California law also fails." Order at 16.

Plaintiffs' unjust enrichment claims is also barred by Plaintiffs' allegation that a contract exists between them and P&G relating to the ZzzQuil claim. "Under California law, there cannot be a claim based on quasi contract where there exists between the parties a valid express contract covering the same subject matter." *Stewart v. Kodiak Cakes, LLC*, 537 F. Supp. 3d 1103, 1159 (S.D. Cal. 2021). By virtue of bringing their express warranty claim, *see* SAC ¶¶ 122–30, Plaintiffs allege there is an express contract between themselves and P&G governing the sale of ZzzQuil. *Strumlauf v. Starbucks Corp.*, 192 F. Supp. 3d 1025, 1032–33 (N.D. Cal. 2016) ("Even though there was no *written* contract at issue in this case, Plaintiffs still allege an express contract by alleging" their express warranty claim.). Plaintiffs also have not pled their claims in their alternative, because they have incorporated that allegation by reference into their unjust enrichment claim. *See* SAC ¶ 131. As a result, Plaintiffs' unjust enrichment claim cannot proceed. *Deras v. Volkswagen Grp. of Am., Inc.*, 2018 WL 2267448, at *3 (N.D. Cal. 2018) (Tigar, J.) (dismissing unjust enrichment claim where plaintiff "allege[d] that a valid express contract covering the same subject matter exists between the parties" (citation omitted)); *Strumlauf*, 192 F. Supp. 3d at 1033 (dismissing quasi-contract claim where plaintiffs brought express warranty claim); *Stewart*, 537 F. Supp. 3d at 1159 (same).

**CONCLUSION**

This Court should dismiss the Second Amended Complaint with prejudice.

Dated: October 18, 2024

Respectfully submitted,

/s/ Mariam Azhar

Mariam Azhar (SBN 329715)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: (415) 591-6000
Email: mazhar@cov.com

Andrew Soukup (*pro hac vice*)
Sameer Aggarwal (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000
Email:  asoukup@cov.com
         saggarwal@cov.com

*Attorneys for Defendant*
*The Procter & Gamble Company*

DEFENDANT'S NOTICE OF MOTION AND
MOTION TO DISMISS SECOND AMENDED
COMPLAINT

22

Civil Case No. 4:23-cv-05443-JST